# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: APPRAISAL OF DELL INC. | ) | C.A. No. 9322-VCL |
| | ) | |

## MEMORANDUM OPINION

Date Submitted: March 2, 2016
Date Decided: May 31, 2016

Stuart M. Grant, Michael J. Barry, Christine M. Mackintosh, GRANT & EISENHOFER, P.A., Wilmington, Delaware; *Counsel for Petitioners*.

Gregory P. Williams, John D. Hendershot, Susan M. Hannigan, Andrew J. Peach, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Susan E. Hurd, ALSTON & BIRD LLP, Atlanta, Georgia; Gidon M. Caine, ALSTON & BIRD LLP, East Palo Alto, California; Charles W. Cox, ALSTON & BIRD LLP, Los Angeles, California; *Counsel for Respondent*.

**LASTER, Vice Chancellor.**

The petitioners owned shares of common stock of Dell Inc. (the "Company"). In 2013, the Company completed a merger that gave rise to appraisal rights (the "Merger"). The petitioners sought appraisal. Based on the evidence presented at trial, the fair value of the Company's common stock at the effective time of the Merger was $17.62 per share.

## I.     FACTUAL BACKGROUND

Trial took place over four days. The parties introduced over 1,200 exhibits and lodged seventeen depositions. Seven fact witnesses and five experts testified live. The laudably thorough pre-trial order contained 542 paragraphs. The pre-trial and post-trial briefing totaled 369 pages.

### A.     An Evolving Company

In 1983, at the age of nineteen, Michael Dell started the Company in his freshman dorm room at the University of Texas at Austin. Within two years, the Company achieved annual sales of more than $40 million. On June 22, 1988, the Company went public.

Over time, the Company expanded its operations to include sales of PCs, servers, and storage devices to both consumers and businesses. Mr. Dell[1] remained at the helm of the Company until 2004. He rejoined the Company in 2007.

---

[1] My usual practice is to identify individuals by their last names without honorifics. In this case, the risk of confusion between Mr. Dell, the biological person, and Dell, the corporate person, warrants an exception. The same risk does not exist for others, who are identified without honorifics. No disrespect is intended.

After returning, Mr. Dell came to believe that the Company needed to evolve to meet competitive threats. One threat came from the low-margin producers. The Company sold primarily high-margin, premium-priced PCs. That market was shrinking as advances in technology enabled cheaper computers to provide better performance. Competitors were capturing market share by selling cheaper PCs at low margins.

Another threat was from new products. In 2007, Apple Inc. introduced the iPhone. In 2010, Apple introduced the iPad. Consumers embraced smartphones and tablets. Both ate into the traditional PC market.

A third threat affected the Company's server business. In 2007, Amazon.com, Inc. introduced a cloud-based storage service. The Company sold servers to companies that maintained their own technology infrastructure, and the cloud eliminated that need.

Mr. Dell believed that the Company needed to reduce its reliance on PC sales to end users and increase its sales of software and services to enterprise customers. In 2009, the Company started its transformation, which Mr. Dell planned to achieve through acquisitions.

Between 2010 and 2012, the Company spent approximately $14 billion to acquire eleven businesses. Mr. Dell believed that with these acquisitions, the Company's transformation was complete, although it would take time to integrate the new businesses and for them to perform in accordance with his expectations. Mr. Dell and his management team were confident that the newly assembled enterprise division would bear fruit, and they also believed that the Company would continue to grow its PC business at a rate of 1-2% annually. In a sum-of-the-parts analysis prepared in January

2011, they valued the Company at $22.49 per share (by line of business) and $27.05 per share (by business unit).

**B.      The Company's Market Price Implies A Different View.**

Management's internal valuations were significantly higher than the market price of the Company's stock, which traded around $14 per share during the same period. Mr. Dell lamented that the market just "didn't get" the Company. Tr. 409 (Mr. Dell). He thought that in spite of the Company's transformation, "Dell [was] still seen as a PC business." JX 44 at 1.

Mr. Dell conferred with his management team and hired consultants to devise strategies to help the market view the Company as "a sum of the parts." JX 46 at 1. Mr. Dell regularly communicated his views to analysts. During a meeting with analysts on June 12 and 13, 2012, management called for a strong performance from the enterprise solutions and services division, projecting that it would account for 60% of the Company's profits by 2016. Management anticipated 12% annual growth in software sales and 22% growth in services revenue. At the same time, management projected that the Company's end-user computing division would grow at a rate of 2% to 5% annually, and that even if end-user computing experienced a downside scenario of 5% *negative* growth annually, earnings and operating income from that division still would increase. Management also announced a $2 billion costs savings initiative.

Management's optimism contrasted with the Company's recent performance. Earnings for the first quarter of FY 2013 were down 22% year over year and below

analysts' expectations. U.S. revenues declined for a fifth straight quarter. Revenues from developing markets remained flat.

Market observers expressed doubt about management's projections. An analyst from Goldman Sachs opined that "Dell's guidance is likely too aggressive on both the revenue and margin perspectives." JX 90 at 5. An analyst from Bernstein Research questioned the cost-saving initiative, observing that "historically . . . Dell's cost cutting programs have been difficult to monitor, with no clear delineation between component cost declines/other industry wide benefits vs. Dell specific take-outs." JX 92 at 2. An analyst from Indigo Equity Research remarked that the cost savings initiative "sound[ed] good," but was "unlikely to succeed well due to the execution hurdles." JX 115 at 8.

The Company's market price suggested that the marginal purchaser shared the analysts' skepticism. During the first half of 2012, the Company's stock declined from a high of around $18 per share to approximately $12 per share.

## C.    Mr. Dell Decides To Propose An MBO.

In June 2012, Staley Cates from Southeastern Asset Management asked Mr. Dell whether he would consider a management buyout ("MBO"). In August, Egon Durban of Silver Lake approached Mr. Dell with the same idea. Mr. Dell decided to consider it. On August 11 and again on August 13, Mr. Dell met with his friend George Roberts of Kohlberg Kravis Roberts & Co. L.P. ("KKR") about whether an MBO made sense. Roberts said he would look into it, and that if the numbers worked out, then KKR would want to participate.

4

The numbers worked out. On Friday August 14, 2012, Mr. Dell called Alex Mandl, the Company's lead independent director, and reported on his conversations with Southeastern, Silver Lake, and KKR. He told Mandl that he wanted to pursue an MBO. The Company's stock closed at $12.19 that day.

The Company's board of directors (the "Board") met the following Monday. Mr. Dell told the directors that he "did not want to proceed further without approval of the Board, and that he would not engage a financial advisor without first informing the Board." JX 106 at 1. After Mr. Dell left the meeting, the Board discussed establishing a special committee.

After the meeting, Mandl told Mr. Dell that the Board would consider an MBO. Mr. Dell passed on the news to Silver Lake and KKR. He did not contact Southeastern.

On August 20, 2012, the Board met by telephone. Mr. Dell did not attend. During the meeting, the Board formed a special committee (the "Committee") and granted to it

> the full and exclusive power and authority of the Board to the fullest extent permitted by law . . . to take any action in connection with [any potential transaction involving Mr. Dell or any other strategic alternative that may be considered by the Board] which the Committee determines in its sole discretion to be advisable.

JX 107 at 3-4. The resolutions provided that the Board would not recommend any transaction without a prior favorable recommendation from the Committee.

The members of the Committee were Mandl, Laura Conigliaro, Janet F. Clark, and Kenneth M. Duberstein. In addition to being the Company's lead independent director, Mandl was a successful businessman with experience on other Fortune 100 boards. Conigliaro was a partner at Goldman Sachs who had covered the tech industry as a senior

5

analyst. Clark was a former CFO of Marathon Oil Corporation with extensive board experience. Duberstein had been the lead independent director at Boeing, served on other major boards, and was the White House Chief of Staff to President Ronald Reagan. None of the members of the Committee had any financial or business ties to Mr. Dell other than their board service.

The Board authorized the Committee to hire its own advisors. The Committee retained Debevoise & Plimpton LLP as its legal counsel and hired JPMorgan Chase & Co. as its financial advisor.

On August 30, 2012, the Board adopted resolutions that expanded the scope of the Committee's authority. Under the new resolutions, the Committee enjoyed the

> full and exclusive power and authority of the Board to the fullest extent permitted by law to
>
> (1) review and to evaluate the terms and conditions, and determine the advisability, of a Proposed Transaction and any alternatives thereto that the Special Committee deems appropriate,
>
> (2) establish, approve, modify, monitor and direct the process and procedures related to the review and evaluation of a Proposed Transaction and any alternatives thereto, including, but not limited to, the authority to determine not to proceed with any such process, procedures, review or evaluation, or to recommend any of the foregoing to the Board,
>
> (3) solicit expressions of interest or other proposals for any strategic alternatives that may be considered by the [Committee],
>
> (4) negotiate with Mr. Dell or any other party that the [Committee] deems appropriate with respect to the terms and conditions of a Proposed Transaction or any alternative thereto and, if the [Committee] deems appropriate, but subject to the limitations of applicable law, approve the execution and delivery of documents in connection with a Proposed Transaction or any alternative transaction on behalf of the Corporation,

(5) determine whether a Proposed Transaction or any alternative thereto negotiated by the [Committee] is fair to, and in the best interests of, the Corporation and its stockholders,

(6) with respect to any actions required to be taken by the full Board with respect to a Proposed Transaction or any alternative thereto, recommend to the full Board what action, if any, should be taken by the Board,

(7) declare a dividend or authorize the issuance of stock of the Company and

(8) take any other action which the [Committee] determines in its sole discretion to be advisable . . . .

JX 123 at 3-4 (formatting added).

## D. The Company's Performance For The Second Quarter Of FY 2013

The day after the Board formed the Committee, the Company held its earnings call for the second quarter of FY 2013. Compared to the prior year, revenue declined by 8%, and earnings per share fell by 13%. The earnings result was consistent with analyst forecasts, but revenue was below expectations. Management forecasted further short-term declines, including a 20% downward revision for earnings per share in FY 2013, but stressed that the Company was following "a long-term strategy [that] will take time." JX 109 at 7. Mr. Dell explained, "We're transforming our business, not for a quarter or a fiscal year, but to deliver differentiated customer value for the long term." JX 110 at 1.

After the call, many analysts decreased their price targets. An analyst from Indigo Equity Research described the Company as a "sinking ship" and stated that "Dell's turnaround strategy is fundamentally flawed [and] the fundamentals are bad. Dell may have responded too late to save itself." JX 115 at 1. An analyst from Sterne Agee said

7

that the "bottom line is that the transformation beyond PCs is tougher and taking much longer than the bulls expected." JX 112 at 1.

**E.     The Committee Starts Its Process.**

During the first week of September 2012, the Committee entered into confidentiality agreements with Silver Lake, KKR, and Mr. Dell. The Committee did not contact Southeastern.

Silver Lake's and KKR's confidentiality agreements included language that prevented them, for a period of eighteen months, from doing any of the following, directly or indirectly:

> (i) propos[ing] any business combination, acquisition or other extraordinary transaction involving the Company, its securities or any substantial part of its assets, or acquir[ing] or agree[ing] to acquire any equity securities of the Company,
>
> (ii) seek[ing] or propos[ing] to influence or control, through a proxy solicitation or otherwise, the board of directors, management or policies of the Company, or attempting to influence or control the Board, management, or policies of the Company, or
>
> (iii) mak[ing] any public disclosure, or tak[ing] any action, including requesting a waiver or modification of any provision of this paragraph, that could reasonably be expected to require the Company to make any public disclosure with regard to any of the foregoing actions.

JX 129; JX 130 (formatting added).

Mr. Dell's confidentiality agreement contained similar restrictions plus additional obligations. Among other things, it prohibited him from

- working with any person or entity with respect to a possible transaction other than Silver Lake or KKR, unless approved in advance in writing by the Company;

- talking to any sources of debt financing without the prior approval of the Company, and

8

- taking any action that would prevent him from working with any potential counterparty or financing source in connection with a transaction or alternative transaction.

JX 125 at 2. The agreement provided affirmatively that "You [Mr. Dell] agree to explore in good faith the possibility of working with any such potential counterparty or financing source if requested by the Committee; it being understood that your decision as to whether to work with any counterparty or financing source after such good faith exploration shall be within your discretion." *Id.*

On September 13, 2012, management provided the Committee with their best estimate for the Company's future performance. Mr. Dell told the Board to "[e]xpect [the] short term to be very challenging" and that achieving the full benefits of the Company's transformation would require "sacrific[ing] short term results." JX 96 at 2. The Company's CFO, Brian Gladden, reviewed financial projections that management previously presented to the Board in July 2012 (the "July Case").

The July Case supported valuations for the Company that were significantly higher than the Company's stock price. As part of the July presentation, management had used the July Case to estimate the Company's value as a stand-alone entity. Management advised the Board that:

> **Industry revenue multiples implies enterprise value of $40B at the end of FY 12**
>
> − Valuation discount of ~$25B driven by execution/transformation "doubts"
>
> **Implied enterprise value should increase by over 50% to almost ~ $70B**
>
> − ~$12B driven by portfolio mix shift

9

– ~$16B driven by higher revenue

JX 97 at 16. Put differently, management thought the Company was worth approximately $25 billion more than its then-current market capitalization of approximately $15 billion. Management noted that projecting the Company's past twelve months of free cash flow into perpetuity would produce a share price of greater than $30, meaning the market price implied that the Company would experience declines in free cash flow of 20% per year into perpetuity.

The Committee members regarded the July Case as "very optimistic" and even "unrealistic." Tr. 147 (Mandl). During the September meeting, the Committee told Gladden to modify the July Case further to take into account a report on the PC industry issued by analysts at the International Data Corporation ("IDC"). The IDC report contained a relatively pessimistic forecast for PC sales over the next five years. Contemporaneous analyst reports expressed more pointed skepticism about the Company's prospects.[2]

On September 14, 2012, the Committee received a presentation from JPMorgan about the transaction process. JPMorgan noted that the Company's "[s]tock price has declined ~25% over the last year while the NASDAQ is up ~25%," and that "[m]issed Street expectations have put investors in a 'wait and see mode' with increased focus on

_____

[2] *See, e.g.*, JX 155 at 1-3 (UBS Investment Research report noting that 55% of analysts had a hold or sell rating on Dell, that the "[t]echnicals [are] ugly," and that investors' concerns included "(1) over half of operating profits still come from the deteriorating PC business, and (2) skepticism that Dell can become a successful enterprise player").

quarter-by-quarter execution and improved visibility." JX 137 at 7. JPMorgan next conveyed its views about the feasibility of an MBO in light of "the basic math by which financial sponsors determine what they are willing to pay in an acquisition transaction," Mr. Dell's ownership of 15.4% of the Company's outstanding shares, and the Company's ability to keep in place after a transaction approximately $5.9 billion of existing debt. JX 136 at 2. The Company's ability to keep approximately 65% of its debt in place "materially reduc[ed] the debt commitments and inherent cost of capital" for a leveraged transaction. JX 137 at 23.

JPMorgan provided the following highlights about a leveraged buyout ("LBO") structure:

- "In an LBO transaction an acquirer ('financial buyer' or 'sponsor') purchases a company with a relatively small amount of equity and significant use of debt";

- "Sponsors seek to generate returns on their equity investment and use financial leverage to increase potential returns";

- "A sponsor typically would expect to realize a return within 3 to 5 years via an outright sale, public offering or recapitalization";

- "Financial buyers evaluate investments with an internal rate of return (IRR) analysis, which measures return on equity";

- "Multiple of cash invested (e.g. 2.0x) is also a key parameter, particularly for larger transactions";

- "IRR will be used as the primary means to determine the appropriate purchase price by a sponsor . . . ."

JX 137 at 21.

JPMorgan also reviewed with the Committee the likelihood of interest from other financial sponsors or strategic bidders. The JPMorgan representatives "noted their belief

11

that KKR and Silver Lake were among the best qualified potential acquirers." JX 136 at 3. They also stated that "there was a low probability of strategic buyer interest in acquiring the Company." *Id.* They nevertheless warned that limiting negotiations to KKR and Silver Lake would create a "[l]ack of competition." JX 137 at 35.

JPMorgan "recommended a process by which KKR and Silver Lake would be given information and an opportunity to make an acquisition proposal[, and the] Committee could then decide how to proceed, including by terminating the process or inviting other potential buyers to participate in the process." JX 136 at 3. After receiving JPMorgan's advice, the Committee decided to "refrain from contacting other sponsor groups until an offer was received [from Mr. Dell and either KKR or Silver Lake] or subsequent events or analysis counseled a different course." *Id.*

On September 17, 2012, and again on September 21, the Committee reconvened to review management's forecasts. Gladden presented revised projections that adjusted for the Company's performance to date, assumed lower customer demand, and reduced margins (the "September Case"). The Committee viewed the September Case as "more realistic" than the July Case but still "overly optimistic." Tr. 147 (Mandl). The Committee nevertheless authorized the September Case to be included in the online data room for use by Silver Lake and KKR in evaluating the Company.

On October 9, 2012, the Committee received a presentation from JPMorgan that provided a preliminary assessment of the Company's value as a standalone entity. The Company's share price had closed the previous day at $9.66. JPMorgan derived the following valuation indications for the Company:

- DCF using the September Case: $20.00 to $27.00 per share.

- DCF using Street high case: $19.25 to $25.75 per share.

- DCF using Street consensus case: $15.25 to $19.25 per share.

- DCF using Street low case: $9.50 to $11.50 per share.

- Discounted equity value assuming price/earnings multiples in FY 2014-15 of 4.0x to 7.0x: $7.00 to $13.50 per share.

- Trading multiples price/earnings multiples of 4.0x to 7.0x and consensus EPS of $1.79 per share: $7.25 to $13.00 per share.

- Analyst price targets of $9.00 to $18.50 per share.

- 52-week trading range of $9.43 to $18.32 per share.

JX 162 at 15.

JPMorgan also provided an analysis of what a financial buyer would be willing to pay based on an industry-standard LBO pricing model. Using the September Case and assuming that the buyer financed the transaction with 3.1x leverage, JPMorgan projected that a financial buyer could pay approximately $14.13 if it engaged in subsequent recapitalizations at the Company. At higher prices, the sponsor could not achieve a minimum five-year IRR of 20%. Assuming a financial sponsor wanted to achieve a range of IRRs of 20% to 25%, JPMorgan placed the likely valuation range at $11.75 to $13.00, or $13.25 to $14.25 if the sponsor engaged in further recapitalizations of the Company.

The next day, October 10, 2012, the Committee received a presentation from Goldman Sachs, which was "assisting the Company's management in preparing for the management presentations that had been made to financial sponsors." JX 166 at 1. Like JPMorgan, Goldman Sachs presented an illustrative LBO analysis based on the

13

September Case. Depending on the assumptions used, Goldman projected that a sponsor could pay approximately $16.00 per share and still generate a five-year IRR of 20%.

On October 18, 2012, the Committee met again and received presentations from both JPMorgan and Goldman. Goldman provided possible reasons why the Company's stock price was disconnected from indications of the Company's fundamental value:

- "[The Company's] current valuation is likely attributable to a range of potential factors including but not limited to:

    – Expectations of lower [Company] growth – both revenue and EPS

    – [PC business] segment financials overwhelming the financial contribution of other segments ([PC business] represents ~50% of revenues)

    – Market outlook for the PC industry

    – Overhang from recent stock and operating underperformance";

- "Another reason for [the Company's] current valuation could be because investors are not attributing full value to its significant cash balances";

- "Companies at the center of industries undergoing major structural changes often suffer from depressed valuations that seem 'disconnected' from fundamentals

    – Many investors believe that the shift to mobile computing represents a significant disruption to the traditional desktop and 'notebook' ecosystem

    – Investors are often reluctant to fight strong 'secular headwinds' even when values become attractive in absolute and relative terms; as a result, valuations can remain depressed for protracted periods."

JX 170 at 6. Goldman observed that "[i]llustrative standalone valuation analyses result in [Company] value outcomes that are significantly higher than the current share price." *Id.* at 4.

**F. Silver Lake And KKR Provide Expressions Of Interest.**

On October 23, 2012, Silver Lake and KKR provided the Committee with expressions of interest. Silver Lake proposed an all-cash transaction valued at between $11.22 and $12.16 a share, excluding shares held by Mr. Dell. KKR proposed an all-cash transaction valued at between $12.00 and $13.00 a share, excluding shares held by Mr. Dell and Southeastern, and based its illustrative analysis on a price of $12.50 per share. KKR's proposal also contemplated an additional $500 million investment by Mr. Dell. Dell's common stock closed at $9.35 that day.

The Committee reviewed the expressions of interest with the assistance of JPMorgan. The 20-30% one-day premium from Silver Lake and the 28-39% one-day premium from KKR were in line with the premiums offered in other large LBOs within the last five years, but that was their only virtue. The ranges were far below all of JPMorgan's DCF analyses except the Street low case. They were at the low end of the valuations implied by JPMorgan's analysis of trading metrics. They even were below the prices suggested by JPMorgan and Goldman's LBO models, implying IRRs for the buyout groups significantly in excess of 20%.

Mr. Dell had not been involved in determining the prices. He was content to participate at whatever pricing the financial sponsors obtained. At the Committee's request, Mr. Dell sent identical emails to Silver Lake and KKR in which he encouraged them to raise their valuations. He proposed a meeting between Company management and the sponsors and asked them a series of questions including "what factors could lead to an improvement" in their proposals. JX 194 at 1; JX 195 at 1.

15

**G.     The Company's Performance For The Third Quarter Of 2012**

During November 2012, market observers became more critical of the Company. On November 9, 2012, Citi Research Equities issued a report that set a price target of $8.50, described the outlook as "muted," and noted that "[i]n addition to our negative views on PCs, we believe [bring your own device] trends in the corporate PC segment will materially pressure Dell's sales, margins and EPS in the future." JX 1225 at 9. Mandl forwarded the report to the Committee, remarking that it provided "a very different outlook from what management has!!" JX 199 at 1. Conigliaro perceived "a potential need for us to consider a very conservative forecast, possibly even one that we once may have viewed as being close to 'worst case' in order for us to get ahead of the downward changes that we have been watching." *Id.* Separately, Gladden agreed that "[m]arket data has deteriorated" and that "many [peer] companies have announced weaker results and lower guidance." JX 180 at 2. He also recognized that "[m]anagement projections appear optimistic given valuation & sell-side estimates of Dell future value." *Id.* at 2. The Committee decided to get external help from Boston Consulting Group, Inc. ("BCG"). They tasked BCG with creating an independent set of forecasts for the Company.

On November 15, 2012, the Company reported its financial results for the third quarter. Revenue and earnings per share came in below the Company's guidance and the Street consensus. Compared to the previous year, revenue was down 11%, and earnings per share were down 28%. At this point, the Company had come in below consensus estimates for revenue in six of the last seven quarters and below consensus estimates for earnings per share in three of the last seven quarters.

16

Analysts cut their price targets, citing structural problems in the PC market and questions about the Company's transformation. JPMorgan noted, however, that there was also "[s]ignificant buying by long-only and value-oriented investors in the two weeks leading up to earnings." JX 204 at 6.

## H.    KKR Drops Out, And The Committee Contacts TPG.

On December 3, 2012, KKR dropped out, saying that it could not "get [its] arms around the risks of the PC business." JX 224 at 1. KKR's investment committee had concluded that the Company's recent operating performance validated analysts' concerns.

The Committee was disappointed, because it now only had one sponsor in the process and therefore no direct source of pre-signing competition for Silver Lake. Mr. Dell reiterated to Mandl that he was willing "to join up with whoever," but he had not spoken with Southeastern since June. JX 224 at 1. Mr. Dell also told Mandl that he had the ability to supply as much equity capital as was needed to complete a transaction.

On December 4, 2012, Silver Lake submitted a proposal to acquire the Company for $12.70 per share, up from its previous range of $11.22 to $12.16 per share. The Committee rejected the offer as inadequate.

On December 5, 2012, the Committee received its first presentation from BCG. Like the Committee's financial advisors, BCG observed that the Company's low valuation did "not match apparent company strengths," but rather reflected "investor concerns." JX 344 at 42. BCG described the investors' concerns as either a belief that the Company's cash flows were "likely to decline rapidly" or a sense that the Company was

using its cash flow in "value-destroying ways." *Id.* BCG thought that the more likely explanation was a fear of rapidly declining cash flows.

After hearing from BCG, the Committee heard from JPMorgan. Its representatives agreed that investors seemed focused on the Company's short-term results at the expense of its long-term value, commenting that "[l]imited visibility and missed Street expectations appear to have led to increased investor focus on near-term execution." JX 226 at 5. JPMorgan also advised the Committee on whether to approach other suitors pre-signing. JPMorgan noted that an advantage would be the "[o]pportunity to create additional competitive tension," but that "[f]inancial buyers have similar return hurdles that drive value" and the Committee was therefore "[u]nlikely to see any material difference, given comparable LP make-up and return hurdles." *Id.* at 22.

On December 6, 2012, the Committee reported to the full Board regarding its progress.

> Mr. Dell made a presentation to the directors in which he expressed his conviction that taking the Company private was the best course for the Company and its public shareholders. He set out the strategic initiatives he would cause the Company to pursue as a private company, namely, to (i) seek to become more competitive in the global PC industry; (ii) hire thousands of sales people, particularly in the mid-market segment of the Company's enterprise business; (iii) seek to compete more effectively in China; (iv) accelerate changes in the Company's business model from a configure-to-order model to a build-to-stock model, with more pre-configured product offerings; and (v) continue the Company's transformation into a broad IT solutions business.
>
> Mr. Dell stated his belief that all of these initiatives would likely be poorly received by the public markets because they would dramatically reduce near-term profitability and involve significant risk. He expressed the view that the Company could find it difficult to retain its top people in such an environment, and that it could also harm the Company's ability to make

18

acquisitions. According to Mr. Dell, these initiatives could best be accomplished in an environment without quarterly earnings pressure and the risk that shareholder activists might attempt to disrupt the Company's plans. Mr. Dell stated that a transaction was in the best interests of the Company's shareholders because they would receive a portion of the potential upside from these initiatives without bearing the risk.

JX 231 at 2.

The Board decided to invite Texas Pacific Group ("TPG") to explore a potential transaction. Mandl thought TPG might be interested because it had invested in Lenovo Group Ltd., an increasingly dominant value-PC producer, and therefore understood the PC market. Mandl knew TPG's CEO, so he called him. TPG executed a confidentiality agreement, received access to the online data room, and received management presentations. Mr. Dell met with TPG's principals at his home.

On December 23, 2012, TPG informed JPMorgan that it would not submit a bid. TPG reported to the Committee that it believed the "cash flows attached to the PC business were simply too uncertain, too unpredictable to establish an investment case." Tr. 161 (Mandl).

## I. The BCG Projections

On January 2, 2013, BCG provided the Committee with a detailed set of financial forecasts. At a meeting on January 15, BCG updated its projections slightly to account for new information from the bankers and a new IDC data set.

BCG's projections included three different cases. The first was the "BCG Base Case," which was "more pessimistic than" management's September Case but "in-line with recent analyst reports." JX 259 at 13. BCG's other two cases were based on the

19

likelihood of achieving $3.3 billion in cost-savings that management had identified in connection with a $2 billion cost-savings initiative that the Company announced in June 2012. Management had not announced the full $3.3 billion to give itself a "cushion." JX 272 at 2. BCG's other two cases assessed the likelihood of attaining those savings initiatives, which provided incremental value to the BCG Base Case. One assumed that the Company would realize 25% of the savings (the "BCG 25% Case"). The other assumed that the Company would realize 75% of savings (the BCG 75% Case).

BCG believed the BCG 25% Case was attainable and the most reasonable set of projections in light of the Company's performance with past cost-saving initiatives. The Committee doubted that the Company could achieve the BCG 75% Case, which implied margins in FY 2015 higher than the Company or its competitors had ever achieved. The three BCG cases projected the following results:

| BCG Base Case | | | | | |
|---|---|---|---|---|---|
| (in billions) | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
| Revenue | $ 56.85 | $ 56.49 | $ 55.51 | $ 55.05 | $ 54.34 |
| Gross Profit | $ 12.77 | $ 12.89 | $ 12.64 | $ 12.53 | $ 12.30 |
| EBITA | $ 3.85 | $ 3.36 | $ 3.28 | $ 3.17 | $ 2.98 |

| BCG 25% Case | | | | |
|---|---|---|---|---|
| (in billions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
| Revenue | $ 56.45 | $ 55.51 | $ 55.05 | $ 54.34 |
| Gross Profit | $ 12.92 | $ 12.78 | $ 12.81 | $ 12.58 |
| EBITA | $ 3.44 | $ 3.70 | $ 4.01 | $ 3.82 |

| BCG 75% Case | | | | |
|---|---|---|---|---|
| (in billions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
| Revenue | $ 56.45 | $ 55.51 | $ 55.05 | $ 54.34 |
| Gross Profit | $ 12.98 | $ 13.06 | $ 13.36 | $ 13.13 |
| EBITA | $ 3.61 | $ 4.54 | $ 5.69 | $ 5.50 |

**J.      Evercore Joins The Team.**

On January 7, 2013, Evercore pitched the Committee on serving as a second financial advisor who could, if desired, conduct a go-shop. Evercore's materials included a DCF valuation of the Company with a range of $14.27 to $18.40 per share. Evercore's LBO analysis supported prices of $12.36 to $16.08 assuming sponsor IRR demands of 15% to 25%.

The Committee retained Evercore the next day. The engagement letter contemplated a $400,000 monthly retainer and a success fee equal to 0.75% of the incremental value of any superior proposal produced during a go-shop, capped at a total of $30 million.

**K.      Silver Lake Increases Its Bid.**

On January 15, 2013, the Committee met to receive updates from management, BCG, JPMorgan, and Evercore. Silver Lake had informed the Committee that it would increase its proposal to $12.90 per share. In their presentations, JPMorgan and Evercore analyzed the new offer.

JPMorgan's analysis showed that Silver Lake's revised offer was towards the mid-point or upper end of valuation ranges based on trading metrics, trading multiples, market premia, and LBO premia. It was within or above the ranges of values generated by a DCF analysis based on the market low case and the most conservative BCG case, but below the ranges of values generated by a DCF analysis based on the market consensus case, the more optimistic BCG projections, and the September Case. Using its LBO model,

JPMorgan prepared a chart showing what a sponsor could pay depending on its desired level of IRR:

| | Market Low Case | BCG Base Case | BCG 25% Case | BCG 75% Case | Street Consensus | September Case |
|---|---|---|---|---|---|---|
| 20% 4.5 year IRR | $11.79 | $13.23 | $14.52 | $17.08 | $14.23 | $16.81 |
| 25% 4.5 year IRR | $11.43 | $12.67 | $13.75 | $15.88 | $13.50 | $15.66 |
| 30% 4.5 year IRR | $11.14 | $12.23 | $13.13 | $14.92 | $12.92 | $14.73 |

Evercore also prepared an analysis of Silver Lake's proposal. Its valuation conclusions were similar to JPMorgan's. Evercore calculated separately that if the Company performed consistent with the September Case, then at the price it was offering, Silver Lake would achieve a 5-year IRR of 45% and generate a 5.3x multiple on its invested capital, even if Silver Lake exited in five years at the same transaction multiple. Mr. Dell would achieve a 5-year IRR of 50.1% and generate a 6.2x multiple on his invested capital. Evercore calculated that if the Company performed in between the BCG 25% Case and BCG 75% Case, then Silver Lake would achieve a 5-year IRR of 39.8% and generate a 4.5x multiple on its invested capital. Mr. Dell would achieve a 5-year IRR of 44.7% and generate a 5.3x multiple on his invested capital.

Evercore's presentation also addressed the potential for the Committee to generate a higher proposal during a go-shop period. Evercore advised that "[s]ince 2005, there have been 137 transactions with equity values greater than $100 million with go-shop provisions." JX 301 at 26. Of those transactions, "only 16 or 12% resulted in a superior offer," and "[t]he superior offers on average were 20% greater than the initial bid." *Id.*

22

Evercore advised the Committee about various factors that would affect a go-shop. *Id.* at 25.

The Committee discussed recent news leaks about Mr. Dell's exploration of an MBO. In response to the leaks, Blackstone Management Partners LLC had reached out to Evercore about engaging with the Company. Evercore advised the Committee to wait for the go-shop before engaging Blackstone or soliciting additional bids. The petitioners observe correctly that Evercore would earn a contingency fee only from offers produced during the go-shop period, so it had an incentive to prefer that any additional bidder emerge during that phase.

On January 18, 2013, the full Board met, except for Mr. Dell. During an executive session that excluded Mr. Dell and management, the Committee provided an update on its process. Mandl informed the Board of the Committee's recommendation "to target a sale price of $13.75 per share, with $13.60 per share as the minimum sale price for agreeing to a deal." JX 315 at 2. The other directors endorsed the Committee's recommendation.

After the meeting, Mandl told Mr. Dell that the Committee would not support a deal below $13.75 per share. Durban then called Mandl and offered $13.25 a share. Mandl told him that was inadequate. Durban threatened to walk, and Mandl "told him to go ahead." Tr. 169 (Mandl). Silver Lake came back at $13.50, but the Committee stood firm.

At this point, Mr. Dell feared the parties had reached an impasse. To resolve the stalemate, Mr. Dell agreed to roll over his shares at a lower valuation than what the public stockholders would receive.

With Mr. Dell's commitment, Silver Lake increased the price it would pay for the public float. By letter dated February 3, 2013, Silver Lake and Mr. Dell gave the Committee two alternatives: (i) an all-cash transaction at $13.60 per share with the Company able to continue issuing its regular quarterly dividend until closing, or (ii) an all-cash transaction at $13.75 per share with no further dividends. The Committee asked for more, and Silver Lake increased the cash component of the first alternative to $13.65 per share. Silver Lake told the Committee that this was its best and final offer.

## L. The Committee And Silver Lake Reach A Deal.

The Committee met on February 5, 2013, to consider Silver Lake's proposal. Evercore and JPMorgan opined that the transaction consideration of $13.65 per share in cash (the "Original Merger Consideration") was fair to the unaffiliated stockholders from a financial point of view. The bankers' valuation ranges for the Company had not changed materially since their January presentations. JPMorgan derived the following valuation indications for Dell:

- DCF using the September Case: $15.50 to $21.75 per share.

- DCF using Street consensus case: $11.50 to $16.00 per share.

- DCF using Street low case: $10.63 to $13.87 per share.

- DCF using the BCG 75% Case: $15.00 to $21.25 per share.

- DCF using the BCG 25% Case: $12.00 to $16.50 per share.

24

- DCF using the BCG Base Case: $10.50 to $14.25 per share.

- Trading multiples using price/earnings multiples of 5.0x to 10.0x:

  o    using Street consensus: $8.25 to $16.50 per share.

  o    using BCG Base Case: $7.25 to $14.50 per share.

  o    using BCG 25% Case: $9.00 to $18.00 per share.

  o    using BCG 75% Case: $13.00 to $26.00 per share.

- 52-week trading range of $8.86 to $18.32 per share.

JX 331 at 21-22. JPMorgan dropped the discounted equity value approach that it had used in its earlier presentations.

Evercore updated its analysis of the expected return that Silver Lake and Mr. Dell would generate based on the Original Merger Consideration:

|  |  | 4.5 Year IRR | | 4.5 Year Multiple on Invested Capital | |
|---|---|---|---|---|---|
|  |  | Silver Lake | Mr. Dell | Silver Lake | Mr. Dell |
| September | Exit at 4.0x | 38.1% | 43.3% | 4.3x | 5.1x |
| Case | Exit at 5.0x | 44.6% | 50.1% | 5.3x | 6.2x |
| BCG 25% | Exit at 4.0x | 23.3% | 27.9% | 2.6x | 3.0x |
| Case | Exit at 5.0x | 30.2% | 35.1% | 3.3x | 3.9x |
| Street | Exit at 4.0x | 14.8% | 19.2% | 1.9x | 2.2x |
| Median | Exit at 5.0x | 22.3% | 27.0% | 2.5x | 2.9x |

The Committee recommended that the Board accept Silver Lake's offer, which it did. The transaction was documented in an agreement and plan of merger dated February 6, 2013 (together with amendments, the "Merger Agreement") between the Company and three counterparties: Denali Holding Inc., Denali Intermediate Inc., and Denali Acquiror Inc., which were affiliates of Mr. Dell and Silver Lake (together, the "Buyout Group").

Mr. Dell entered into a voting agreement in support of the transaction that required Mr. Dell and his affiliates to vote their shares "in the same proportion as the number of

[s]hares voted by the [u]naffiliated [s]tockholders . . . that are voted in favor of the adoption" of either (i) a superior proposal if the Merger Agreement was terminated or (ii) the adoption of the Merger Agreement in the event the Board changed its recommendation. JX 355 at 2. Mr. Dell also agreed to roll over his shares at $13.36 per share and to invest up to $500 million in additional equity. An affiliate of Mr. Dell agreed to invest up to $250 million in additional equity. Post-closing, Mr. Dell would own 74.9% of the Company and Silver Lake would own 25.1%.

The Merger Agreement provided for (i) a forty-five day go-shop period that would expire on March 23, 2013, (ii) a one-time match right for the Buyout Group that would apply until the stockholder vote, and (iii) a $180 million termination fee if the Company agreed to a Superior Proposal derived from a bid produced during the go-shop. For non-Superior Proposals and bids produced after the go-shop period, the termination fee increased to $450 million.

> The Merger Agreement defined "Superior Proposal" as

> a bona fide written Acquisition Proposal (with the percentages set forth in clauses (ii) and (iii) of the definition of such term changed from 20% to 50% and it being understood that any transaction that would constitute an Acquisition Proposal pursuant to clause (ii) or (iii) of the definition thereof cannot constitute a Superior Proposal under clause (i) under the definition thereof unless it also constitutes a Superior Proposal pursuant to clause (ii) or (iii), as applicable, after giving effect to this parenthetical) that the Company Board has determined in its good faith judgment . . . is more favorable to the Company's stockholders than the Merger and the other transactions contemplated by this Agreement, taking into account all of the terms and conditions of such Acquisition Proposal (including the financing, likelihood and timing of consummation thereof) . . . , provided that notwithstanding the foregoing, an extra-ordinary dividend or share repurchase (or any merger or consolidation that is the economic equivalent of an extra-ordinary dividend or share repurchase) shall not constitute a

Superior Proposal unless it constitutes a Superior Proposal by virtue of clause (iii) of the definition of Acquisition Proposal and the first parenthetical above, and the Person acquiring such shares is not the Company or any of its Subsidiaries.

JX 349 § 5.3(j). The Merger Agreement defined "Acquisition Proposal" as

any bona fide inquiry, proposal or offer made by any Person for, in a single transaction or a series of transactions, (i) a merger, reorganization, share exchange, consolidation, business combination, recapitalization, extra-ordinary dividend or share repurchase, dissolution, liquidation or similar transaction involving the Company, (ii) the direct or indirect acquisition by any Person or group of twenty percent (20%) or more of the assets of the Company and its Subsidiaries, on a consolidated basis or assets of the Company and its Subsidiaries representing twenty percent (20%) or more of the consolidated revenues or net income (including, in each case, securities of the Company's Subsidiaries) or (iii) the direct or indirect acquisition by any Person or group of twenty percent (20%) or more of the voting power of the outstanding shares of Common Stock, including any tender offer or exchange offer that if consummated would result in any Person beneficially owning Shares with twenty percent (20%) or more of the voting power of the outstanding shares of Common Stock.

*Id.* § 5.3(h).

## M.    The Go-Shop Begins.

On February 5, 2013, Evercore began the go-shop process. Within ten days, Evercore had reached out to sixty parties. Evercore believed that the most promising possibilities were Blackstone and Hewlett-Packard Company ("HP"). Blackstone had a sophisticated technology group and one of its partners, David Johnson, had recently worked as the Company's head of acquisitions.

HP was the Company's closest competitor and peer. Evercore reached out to HP on the first day of the go-shop period, and Evercore met with HP on February 13, 2013. At that meeting, Evercore told HP that a Dell-HP combination could achieve $3-4 billion

27

in annual cost synergies. On February 24, HP executed a confidentiality agreement. Evercore believed HP was "actively deliberat[ing]" about making a run at the Company. JX 395 at 2. In reality, HP never accessed the data room and did not submit an indication of interest.

Evercore insisted that Mr. Dell continue to support the process during the go-shop period. When Mr. Dell proposed taking a two-week vacation, Roger Altman of Evercore objected, noting that Mr. Dell "wasn't unavailable to Silver Lake at any point during their final 2 pre-offer weeks." JX 385 at 2. Altman insisted that Mr. Dell "must be available to any other serious party which requests it." *Id.* Mr. Dell complied.

On March 5, 2013, Carl Icahn and Icahn Enterprises L.P. (together, "Icahn") sent a letter to the Board expressing opposition to the Merger and proposing a leveraged recapitalization. The Company would borrow funds sufficient to pay a special dividend of $9 to the Company's stockholders, and Icahn estimated that the stock would trade at approximately $13.81 per share after the transaction, generating aggregate value of $22.81 per share. Evercore representatives thought Icahn's "total value—$9 plus $13— seems crazy" because the "stub value [was] too high," but otherwise Icahn had "the right idea" and considered his proposal was "smart." JX 390 at 1.

Evercore had invited Icahn to participate in the go-shop before the March 5 letter. On March 10, 2013, Icahn and the Company executed a confidentiality agreement, and Icahn accessed the data room the next day. Icahn later had discussions with members of the Company's management.

On March 21, 2013, GE Capital submitted a bid to acquire the Company's financial services unit for $3.6 billion in cash. GE Capital said it was happy to have the Committee consider its offer in connection with any other bid.

On March 22, 2013, Icahn submitted a re-structured transaction that offered stockholders a choice. They could roll over their shares into a new entity on a one-to-one basis, or they could elect to receive $15.00 per share in cash, subject to a cap of $15.6 billion on the total cash payments. If the demands for cash payouts exceeded the cap, then stockholders would receive their *pro rata* share. Evercore valued Icahn's proposal at between $13.37 and $14.42 per share.

Also on March 22, 2013, Blackstone and a consortium of investors proposed a transaction that similarly gave stockholders a choice. Under Blackstone's proposal, the Company's existing stockholders could elect to receive either a cash payment of at least $14.25 per share or a package of stock in a new entity valued at $14.25 per share, subject to a cap on the total amount of equity that the new entity would issue. Morgan Stanley & Co. LLC provided Blackstone with a letter stating it was "highly confident" it could raise the financing for the transaction. JX 422 at 6. But Blackstone also stated that it was "unwilling to expend additional time and resources" pursuing the transaction without "a more level playing field." *Id.* Blackstone asked the Committee to reimburse its out-of-pocket due diligence expenses and said that otherwise it would withdraw its offer. Evercore and JPMorgan valued Blackstone's proposal at face value, or $14.25 per share.

On March 23, 2013, the go-shop period ended. The Committee determined that the Icahn and Blackstone offers were, or could reasonably be expected to lead to, Superior

Proposals. This meant that each qualified as an "Excluded Party," and the Company only would have to pay a $180 million termination fee if it entered into a transaction with either of them.

The Committee considered Blackstone's request for fee reimbursement but did not want to risk breaching the Merger Agreement and giving the Buyout Group a chance to walk. The Committee therefore asked that the Buyout Group consent to the reimbursement. The Buyout Group agreed on the condition that Silver Point receive a similar payment. The Committee obliged and authorized the Company to reimburse Silver Lake's and Blackstone's actual due diligence expenses up to a cap of $25 million each. The Committee did not make a similar offer to Icahn.

On April 2, 2013, Icahn asked for the same type of expense reimbursement. At the time, Icahn and the Committee were negotiating over Icahn's request for a waiver of the interested stockholder limitations under 8 *Del. C.* § 203, and the Committee's request in response that Icahn agree not to acquire any additional shares. Fearing that Icahn might turn hostile, the Committee decided to condition any expense reimbursement on Icahn agreeing to enter into standstill.

During this period, the Committee and Mr. Dell seemed receptive to an alternative transaction involving Blackstone. In an email, Mr. Dell told Blackstone that he felt they were "substantially in agreement" on a vision for the Company and that he was "open to considering all alternatives." JX 430 at 1. Mr. Dell's outstanding issues were "the capital structure" and "a proposal on governance." JX 428 at 1. Blackstone also seemed to like Mr. Dell, but Blackstone was also prepared to proceed without him. According to a

30

Reuters report, Blackstone began vetting alternative CEO candidates. Mr. Dell took offense at the perceived snub and communicated his feelings to Blackstone. Blackstone's CEO did not respond to Mr. Dell's calls.

Blackstone made a significant commitment to due diligence. Over 460 individuals associated with Blackstone accessed the virtual data room. Approximately forty Blackstone and twenty Company employees assembled in a ballroom in Texas to conduct additional diligence. The room was so large that directions had to be given over a microphone. Mr. Dell noted that he "spent more time with Blackstone than any of the other participants." JX 461 at 1. The Company's management team as a whole spent more time with Blackstone than Silver Lake.

### N.    The Company Suffers Further Market Setbacks.

On April 10, 2013, IDC published a report stating that worldwide PC shipments had declined 13.9% year over year and 13.2% quarter over quarter. Those numbers "stunned" the Committee. Tr. 182 (Mandl). Conigliaro asked BCG to re-evaluate its previously expressed view that market trends in the PC business were having only a "relatively modest impact on the Dell earnings power"; Conigliaro believed that IDC's numbers reflected a "changing ecosystem." JX 497 at 1.

Mr. Dell had a different reaction. Although the Company's sales of PCs had declined by 10.9% year over year and 4.9% quarter over quarter, the Company had increased its market share by 0.4% and 1% respectively during the same periods. Mr. Dell viewed market share as more important, and he reacted to the report by explaining, "This is what we love to see!! Let's keep it going!!" JX 458 at 1. Mr. Dell's comment

confirms that he was focused on a long-term strategy of stabilizing revenues and capturing market share at the expense of short-term margins, just as he repeatedly had told the Board, the Committee, and stock market analysts.

On April 18, 2013, Blackstone dropped out of the sale process. Its letter to the Committee stated that

> a number of significant adverse issues have surfaced since we submitted our letter proposal to [the Committee] on March 22nd, including: (1) an unprecedented 14 percent market decline in PC volume in the first quarter of 2013, its steepest drop in history, and inconsistent with Management's projections for modest industry growth; and (2) the rapidly eroding financial profile of Dell. Since our bid submission, we learned that the company revised its operating income projections for the current year to $3.0 billion from $3.7 billion.

JX 476 at 2. Notably, Blackstone had *not* been given the internal forecasts for the Company that BCG had prepared, so it did not have access to that alternative view of the Company's projected cash flows. Blackstone first learned of the projections when they were included in the Company's preliminary proxy statement.

On May 9, 2013, Icahn and Southeastern joined together to propose a modified recapitalization in which stockholders would retain their current holdings and could elect to receive either (i) a distribution of $12.00 per share in cash or (ii) $12.00 worth of additional shares of stock, with the new equity issued at a value of $1.65 per share. Icahn and Southeastern proposed replacing the Board with a slate of new directors who they believed would approve their transaction. Because it was strictly a leveraged recapitalization, Evercore thought it was unlikely that Icahn's new proposal could qualify as a Superior Proposal under the Merger Agreement. Tr. 382-83 (Hiltz).

32

On May 16, 2013, the Company released its results for the first quarter of FY 2014. Revenue declined just 2% from the previous year, but net income declined by 79%. GAAP earnings per share fell 81% year over year, and non-GAAP earnings fell 51%. According to an analyst from Bernstein Research, the margins for the enterprise solutions and services segment were "woeful, and well below industry peers." JX 515 at 3. Even Gladden expressed doubts, commenting on the Bernstein report that "[i]t's not apparent that the shift to growth will bring profit and cash in the short or long term." *Id.* at 1.

"Most [analysts] were shocked at the profitability results." *Id.* at 1. Revenues beat Street estimates by about 4%, but earnings per share came in approximately 29% below the consensus. According to BCG, the quarter "miss [was] HUGE." JX 513 at 1. Analysts disagreed about the long-term implications for the Company. The Bernstein analyst focused on the enterprise solutions and services division, noting that it generated "essentially no profits," which was "a sober finding, given the company's strategic intent is to migrate the company to enterprise offerings." JX 515 at 3. The analyst attributed the division's poor performance to "myriad factors – none of which have easy fixes." *Id.*

After the Company's poor quarter, the market consensus for FY 2014 operating income dropped by 24% from $3.3 billion to $2.5 billion. By contrast, analysts increased their expectations for HP by 3% during the same period, suggesting that they had particular concerns about the Company. The market consensus forecast for operating income during FY 2014 fell short of the BCG Base Case by approximately $800 million. The Company's earnings release indicated annualized EBITA for FY 2014 was trending to $2.54 billion, also about $800 million below the BCG Base Case.

Despite the Company's poor quarterly performance, BCG continued to believe that the Company's long-term earnings power would not be adversely affected by the market trends. BCG believed that the market had *not* deteriorated more than that projected in the BCG Base Case and attributed the Company's poor results to management's decision to sacrifice margins to maintain market share.

By contrast, on the cost-savings initiatives, BCG concluded that the "[p]roductivity cost take out" was "not on track and will not deliver bottom line benefits in FY14." JX 536 at 19. Although the costs savings underlying the BCG 25% Case remained "achievable," they were "unlikely to be realized in [this] year under current strategy." *Id.* at 23. This made the BCG 75% Case even less likely.

## O.    Stockholder Opposition Leads To A Price Bump.

The Board scheduled a special meeting of stockholders to vote on the Merger for July 18, 2013. The Board set a record date for the meeting of June 3. Icahn opposed the Merger. Many value-based investors, including T. Rowe Price, also opposed the Merger. They had bought stock believing that the market was under-valuing the non-PC-related businesses. These stockholders had the same investment thesis as Mr. Dell.

On May 31, 2013, the Company filed its definitive proxy statement. In the proxy statement, the directors disclosed that the "Committee did not seek to determine a pre-merger going concern value for the Common Stock to determine the fairness of the merger consideration to the Company's unaffiliated stockholders." JX 532 at 71. The Committee instead cited other reasons for recommending the transaction, such as the (i) the certainty of cash consideration, (ii) the approximately 37% premium over the ninety-

34

day-average unaffected trading price of $9.97, and (iii) the approximately 25% premium over the one-day unaffected trading price of $10.88. The Committee also cited the declining Street consensus for the Company's earnings per share, which had been $2.02 in August 2012 and had fallen to $1.66 by February 2013, when the Merger was announced. In June 2013, after the proxy statement was issued, the Street consensus fell to $1.00.

On June 6, 2013, Icahn filed his preliminary proxy statement. On June 18, Icahn disclosed that his affiliates had purchased approximately 72 million shares of common stock from Southeastern at $13.52 per share.

On June 19, 2013, Icahn wrote to the Company's stockholders to say he would run an alternate slate of directors at the annual meeting. Once his slate won, the new directors would jettison the Merger and implement a self-tender at $14 per share for approximately 1.1 billion shares. Icahn represented that he would not tender. On July 1, he announced lender commitments for $5.2 billion in debt financing for the tender offer.

Supporters of the Merger received a boost on July 8, 2013, when Institutional Shareholder Services, Glass Lewis & Co. and Egan-Jones Rating Company recommended that stockholders vote in favor of the Merger.

On July 12, 2013, Icahn revised his self-tender proposal to add one warrant for every four shares tendered. Each warrant would entitle the holder for a period of seven years to purchase one share of Company common stock for $20.

On July 17, 2013, the Committee learned from its proxy solicitor that stockholders were not likely to approve the Merger at the special meeting on the next day. Rather than holding the vote, the Committee convened the meeting and adjourned it until July 24.

Seeking to avoid defeat at the polls, the Buyout Group delivered a revised proposal to the Committee on July 23, 2013. The original Merger Agreement required that a majority of all unaffiliated stockholders approve the Merger. The revised proposal called for reducing the requirement to a majority of the unaffiliated stockholders present at the meeting or voting by proxy. In exchange, the Buyout Group proposed to increase the merger consideration by $0.10 per share.

On July 24, 2013, the Committee convened the meeting and adjourned it until August 2. On July 30, the Committee rejected the revised proposal as inadequate. The market price of the Company's common stock fell 2.55% on the news. Some observers thought the Merger was dead.

On July 31, 2013, the Buyout Group offered a package of additional consideration in return for the lowered voting condition. The package contemplated

- an additional $0.10 per share in merger consideration, increasing the total merger consideration to $13.75,

- a special cash dividend of $0.08 per share,

- a commitment that the Company would pay its third quarter dividend of $0.08 per share, regardless of the closing date, and

- a reduction in the termination fee from $450 million to $180 million if a leveraged recapitalization or similar transaction occurred within twelve months after stockholders voted down the Merger.

The Committee countered, saying it would accept the revised offer if the special cash dividend was raised to $0.13. The Buyout Group agreed. Taking into account the dividends, the total value of the package was $13.96 per share. Mr. Dell financed the change by agreeing to reduce the value attributed to his rollover shares from $13.36 to $12.51.

On August 2, 2013, the Committee met. JPMorgan and Evercore opined that the increased merger consideration of $13.75 per share (the "Final Merger Consideration") was fair from a financial point of view to the unaffiliated holders of the Company's common stock. JPMorgan relied on the same projections it used in February when opining that the Original Merger Consideration was fair. JPMorgan observed that since then, the PC industry had shown "continued softness and deterioration," making the increased offer superior compared to its earlier opinion. Tr. 742 (Rajkovic).

Evercore's analysis changed. When Evercore valued the Company in February, it relied on a forecast projecting annual operating income for FY 2014 of $3.7 billion. The first quarter of FY 2014 resulted in annualized (non-GAAP) operating income of $2.4 billion. The first six months of FY 2014 resulted in annualized operating income of $2.2 billion. As a result, Evercore "had no confidence in" the projections, so it used primarily market-based metrics to opine that the Final Merger Consideration was fair. Tr. 408 (Hiltz).

The Committee recommended that the Board approve the revised transaction, which it did. By agreement dated August 2, 2013, the Buyout Group and the Company amended the Merger Agreement to account for the changed voting condition and the

37

additional consideration. Also on August 2, the Committee convened and adjourned the special meeting until September 12, 2013.

## P.    More Results And Forecasts

On August 15, 2013, the Company reported its financial results for the second quarter of FY 2014. Revenue increased but margins suffered. For a second consecutive quarter, net income declined, this time by more than 70% year over year.

The next day, IDC issued a public report in which it lowered its five-year forecast for PC shipments to negative 8%. This was 62 basis points lower than its August 2011 forecast and 41 basis points lower than its August 2012 forecast. IDC opined that the Company's enterprise solutions and services division would face "intense competition." JX 660 at 2-3.

Mr. Dell took an optimistic view of the IDC report. In an email to Silver Lake, he expressed pride that IDC continued to identify the Company as the largest and most profitable supplier of computers to end users. Although Lenovo and HP sold more units, the Company continued to dominate in premium products. Mr. Dell compared the Company to Mercedes and Lenovo to Hyundai.

Around this time, the Company's management and the Buyout Group made a presentation to the rating agencies on the Company's post-acquisition debt. They used a set of projections that were more optimistic than analyst forecasts or the IDC report and contemplated 2-3% growth over the long term. Management told the rating agencies that the Company was "well on [its] way" to achieving $1.3 billion out of a targeted $3.5 billion in cost-savings, and they were "very confident" that the Company would deliver

the remaining savings. JX 669 at 27. Management recognized that "[f]inancial performance has been mixed over the past 5 years" and explained that it was the result of "conscious trade-offs to reposition and transform the company." *Id.* at 32.

In September 2013, Silver Lake and Mr. Dell made a presentation to the banks that would finance the Merger. The materials included a revised set of projections that contemplated lower gross profit and EBITA relative to an earlier set of projections it submitted to banks, but increased revenues (the "Bank Case"). The Bank Case also projected that the Company's margins would *increase* over of next five years. The Bank Case modeled $3.6 billion in cost savings, with $2.6 billion appearing in the forecasts and another $1 billion as a separate line item. The "cumulative realized incremental cost savings" identified $500 million in savings in FY 2015, and $1 billion in each the following three years. JX 678 at 13. The Bank Case included the following key metrics.

| Bank Case | | | | | |
|---|---|---|---|---|---|
| (in billions) | **FY 2014** | **FY 2015** | **FY 2016** | **FY 2017** | **FY 2018** |
| **Revenue** | $ 57.20 | $ 58.71 | $ 60.24 | $ 62.03 | $ 63.15 |
| **Gross Profit** | $ 11.64 | $ 12.42 | $ 12.98 | $ 13.56 | $ 13.93 |
| **EBITA** | $ 2.76 | $ 3.15 | $ 3.53 | $ 3.90 | $ 4.14 |

While presenting the Bank Case, Silver Lake produced a chart that modeled its expected IRRs depending on the degree to which the Company achieved its cost-savings goals and the EBITDA multiple for an anticipated exit. The chart emphasized an exit multiple of 4.5x and asked the banks to treat that outcome as the model case:

| Annual Cost Savings | FY2018E Trailing EBITDA Exit Multiple | | | | |
|---|---|---|---|---|---|
| | **3.0x** | **4.0x** | **4.5x** | **5.0x** | **6.0x** |
| **$0** | 15.6% | 25.1% | 29.2% | 32.7% | 38.8% |
| **$500** | 21.5% | 30.5% | 34.2% | 37.8% | 43.6% |
| **$1000** | 26.6% | 35.1% | 38.7% | 42.2% | 47.9% |

With zero incremental cost savings, Silver Lake anticipated achieving an IRR of 29.2%, indicating that even for purposes of the LBO pricing model, the Final Merger Consideration was a great deal for the Buyout Group. JX 679 at 96-97.

**Q.      Stockholders Approve The Deal.**

The special meeting took place on September 12, 2013. Under Delaware law, a merger requires the approval of holders of a majority of the outstanding shares, making that the appropriate denominator for consideration. In the Company's case, holders of 57% of the Company's shares voted in favor of the Merger. Because not all stockholders vote, and because a non-vote counts the same as a "no" vote, the percentage always will be higher for the shares that actually voted. In the Company's case, holders of approximately 70% of the shares present at the meeting voted in favor. Both are relatively low margins.

Icahn and Southeastern indicated originally that they would seek appraisal if the Merger was approved, and they encouraged other stockholders to do so. Instead, Icahn and Southeastern withdrew their appraisal demands. Icahn withdrew his competing director nominations.

On October 21, 2013, BCG wrapped up its engagement by providing the Committee with a final report on the Company. Because the Committee did not ask, BCG did not update its forecasts. But BCG noted that it expected that end-user computing, which accounted for two-thirds of the Company's operating income, to decline between 8% and 15% per year. BCG also noted that the "PC market has been unusually turbulent" and its "modeling indicates there is a potential for rapid ~$1.5B decline in" the end-user

40

computing division's operating income by FY 2017. JX 721 at 4. BCG expected that enterprise solutions and services, which accounted for the other third of the Company's operating income, would grow between 5 and 8% per year, but BCG did not think the growth would "close [the] gap" in operating income caused by the weakening end-user computing division. JX 721 at 4. To "close the gap," the Company would have to rely on cost-savings initiatives. BCG repeated its assessment from May that the BCG 25% Case remained achievable, but given management execution, the Company was not likely to realize the necessary savings to support the projections until the end of the fiscal year.

On October 28, 2013, the Company issued a $0.13 special dividend to all stockholders. The Merger closed the next day. By operation of law, any shares of common stock held by public stockholders who did not seek appraisal and perfect their appraisal rights properly were converted into the right to receive the Merger Consideration, without interest.

## II.    LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc. (Technicolor I)*, 542 A.2d 1182, 1186 (Del. 1988). Section 262(h) of the Delaware General Corporation Law (the "DGCL") states that

> the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.

8 *Del. C.* § 262(h). The statute thus places the obligation to determine the fair value of the shares squarely on the court. *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 361-62 (Del. 1997).

Because of the statutory mandate, the allocation of the burden of proof in an appraisal proceeding differs from a liability proceeding. "In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999). "No presumption, favorable or unfavorable, attaches to either side's valuation." *Pinson v. Campbell–Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989).

> Each party also bears the burden of proving the constituent elements of its valuation position by a preponderance of the evidence, including the propriety of a particular method, modification, discount, or premium. If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.

*In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 550 (Del. Ch. 2014) (quoting Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. §§ IV(H)(3), at A-89 to A-90 (BNA) (collecting cases) [hereinafter Appraisal Rights]).

"In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorporation*, 737 A.2d at 525-26. "The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make

appropriate adjustments to the resulting valuation."[3] The court also may "make its own independent valuation calculation by . . . adapting or blending the factual assumptions of the parties' experts." *M.G. Bancorporation*, 737 A.2d at 524. It is also "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." *Id.* at 526. "When . . . none of the parties establishes a valuation that is persuasive, the Court must make a determination based on its own analysis."[4]

The standard of "fair value" is "a jurisprudential concept that draws more from judicial writings than from the appraisal statue itself." *Del. Open MRI*, 898 A.2d at 310. "The concept of fair value under Delaware law is not equivalent to the economic concept of fair market value. Rather, the concept of fair value for purposes of Delaware's appraisal statute is a largely judge-made creation, freighted with policy considerations."

---

[3] Appraisal Rights, *supra*, at A-31 (citing *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 907 (Del. Ch. 1999) (basing fair value calculation on one expert's valuation, "modifying it where appropriate by the primary adjustment claims asserted by [the company]"); *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *5 (Del. Ch. June 15, 1995) ("I will not construct my own DCF model. From the evidence presented by [the] experts, I will choose the DCF analysis that best represents Silgan's value. Next, . . . I will scrutinize that DCF analysis to remove the adversarial hyperbole that inevitably influences an expert's opinion in valuation proceedings." (citation omitted))).

[4] *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993); *accord Del. Open MRI Radiology Assocs. P.A. v. Kessler*, 898 A.2d 290, 310-11 (Del. Ch. 2006) (Strine, V.C.) ("I cannot shirk my duty to arrive at my own independent determination of value, regardless of whether the competing experts have provided widely divergent estimates of value, while supposedly using the same well-established principles of corporate finance.").

43

*Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at \*12 (Del. Ch. Apr. 25, 2005)

(Strine, V.C.). In *Tri-Continental Corp. v. Battye*, 74 A.2d 71 (Del. 1950), the Delaware

Supreme Court explained in detail the concept of value that the appraisal statute employs:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents the true or intrinsic value, . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered . . . .[5]

Subsequent Delaware Supreme Court decisions have adhered consistently to this

definition of value.[6]

"The time for determining the value of a dissenter's shares is the point just before

the merger transaction 'on the date of the merger.'" Appraisal Rights, *supra*, at A-33

---

[5] *Id.* at 72. Although *Battye* is the seminal Delaware Supreme Court case on point, Chancellor Josiah Wolcott initially established the meaning of "value" under the appraisal statute in *Chicago Corp. v. Munds*, 172 A. 452 (Del. Ch. 1934). Because there was a "material variance" between the Delaware appraisal statute, which used "value," and the comparable New Jersey statute that served as a model for the Delaware statute, which used "full market value," Chancellor Wolcott held the plain language of the statute required "value" to be determined on a "going concern basis." *Id.* at 453-54.

[6] *See, e.g.*, *Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Hartnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975).

(quoting *Technicolor I*, 542 A.2d at 1187). Put differently, the valuation date is the date on which the merger closes.[7] Consequently, if the value of the corporation changes between the signing of the merger and the closing, the fair value determination must be measured by the "operative reality" of the corporation at the effective time of the merger.[8]

The statutory obligation to make a single determination of a corporation's value introduces an impression of false precision into appraisal jurisprudence. "The value of a corporation is not a point on a line, but a range of reasonable values, and the judge's task is to assign one particular value within this range as the most reasonable value in light of all the relevant evidence and based on considerations of fairness." *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. July 9, 2004), *aff'd in part, rev'd on other grounds*, 884 A.2d 26 (Del. 2005).

_____

[7] *Cede & Co. v. Technicolor, Inc. (Technicolor II)*, 684 A.2d 289, 298 (Del. 1996) ("[T]he dissenter in an appraisal action is entitled to receive a proportionate share of fair value in the *going concern* on the date of the merger . . . ."); *Universal Studios*, 334 A.2d at 221 (explaining that making a "determination of value as of the day of merger [is] the Court's endeavor").

[8] *Technicolor II*, 684 A.2d at 298; *accord M.G. Bancorp.*, 737 A.2d at 525 ("[T]he corporation must be valued as a going concern based upon the operative reality of the company as of the time of the merger." (quotation marks omitted)); *Gonsalves v. Straight Arrow Publ'rs, Inc. (Gonsalves III)*, 793 A.2d 312, 316 (Del. Ch. 1998) ("Overall, the focus is on the operative reality on the date of the merger." (quotation marks and footnote omitted)), *aff'd in pertinent part, rev'd on other grounds*, 725 A.2d 442 (Del. 1999) (TABLE).

## A. The Final Merger Consideration As The Best Evidence Of Fair Value

The Company contends that the Final Merger Consideration is the best evidence of the Company's fair value on the closing date. As the proponent of this valuation methodology, the Company bears the burden of establishing its reliability and persuasiveness. In this case, the Final Merger Consideration is certainly a relevant factor, but it is not the best evidence of the Company's fair value.

### 1. Deal Price As A Subset Of Market Value

The consideration that the buyer agrees to provide in the deal and that the seller agrees to accept is one form of market price data, which Delaware courts have long considered in appraisal proceedings. *See generally* Appraisal Rights, *supra*, at A-57 to A-59. Traditionally, Delaware decisions focused on stock market prices, rather than the deal price. "[T]here is extensive case law on [the use of stock] market value because of its role as one of the three elements of the Delaware Block Method." *Id.* at A-57. Chancellor Allen summarized the law as follows:

> It is, of course, axiomatic that if there is an established market for shares of a corporation the market value of such shares must be taken into consideration in an appraisal of their intrinsic value. . . . It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in the appraisal of stock.

*Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at *31 (Del. Ch. Oct. 19, 1990) (quoting *In re Del. Racing Ass'n*, 213 A.2d 203, 211 (Del. 1965) (citing *Tri-Cont'l* and *Munds*)), *rev'd on other grounds*, 636 A.2d 956 (Del. 1994). Numerous cases support

Chancellor Allen's observations that (i) pricing data from a thick and efficient market should be considered[9] and (ii) market price alone is not dispositive.[10]

Recent jurisprudence has emphasized Delaware courts' willingness to consider market price data generated not only by the market for individual shares but also by the market for the company as a whole. If the merger giving rise to appraisal rights "resulted from an arm's-length process between two independent parties, and if no structural impediments existed that might materially distort the 'crucible of objective market

---

[9] *See Gonsalves III*, 793 A.2d at 326 (noting that the "market value model[ ] . . . may be used, in an appropriate situation, to provide a relevant estimate of fair value"); *ONTI*, 751 A.2d at 915 (considering stock price by valuing the shares at a discount to that price to "factor in this limited market for the shares"); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) (determining value of shares "primarily based upon an estimated actual market value of the stock"). Relatedly, when this court has considered comparable company analyses in valuations, it has relied in part upon the market prices of other companies that were found to be similar to the company at issue. *See*, *e.g.*, *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *18-20 (Del. Ch. Aug. 19, 2005) (Strine, V.C.); *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *8 (Del. Ch. May 20, 2004); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *9 (Del. Ch. July 25, 2003).

[10] *See*, *e.g.*, *Rapid–Am. Corp.*, 603 A.2d at 806 ("[T]he Court of Chancery long ago rejected exclusive reliance upon market value in an appraisal action."); *Kirby Lumber*, 413 A.2d at 141 ("[M]arket value may not be taken as the sole measure of the value of the stock."); *Del. Racing*, 213 A.2d at 211 ("It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in the appraisal of stock."); *Jacques Coe & Co. v. Minneapolis–Moline Co.*, 75 A.2d 244, 247 (Del. Ch. 1950) (observing that market price should not be exclusive measure of value); *Munds*, 172 A. at 455 ("There are too many accidental circumstances entering into the making of market prices to admit them as sure and exclusive reflectors of fair value.").

reality,'" then "a reviewing court should give substantial evidentiary weight to the merger

price as an indicator of fair value."[11]

Here too, however, the Delaware Supreme Court has eschewed market

fundamentalism by making clear that market price data is neither conclusively

determinative of nor presumptively equivalent to fair value:

> Section 262(h) neither dictates nor even contemplates that the Court of Chancery should consider the transactional market price of the underlying company. Rather, in determining "fair value," the statute instructs that the court "shall take into account all relevant factors." Importantly, this Court has defined "fair value" as the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction. Determining "fair value" through "all relevant factors" may be an imperfect process, but the General Assembly has determined it to be an appropriately fair process. . . .
>
> Section 262(h) unambiguously calls upon the Court of Chancery to perform an *independent* evaluation of "fair value" at the time of a transaction. It vests the Chancellor and Vice Chancellors with significant discretion to consider "all relevant favors" and determine the going concern value of the underlying company. Requiring the Court of Chancery to defer— conclusively or presumptively—to the merger price, even in the face of a pristine, unchallenged transactional process, would contravene the unambiguous language of the statute and the reasoned holdings of our precedent. It would inappropriately shift the responsibility to determine

---

[11] *Highfields Capital, Inc. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007); *see also M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 796 (Del. 1999) ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Prescott Gp. Small Cap, L.P. v. Coleman Co.*, 2004 WL 2059515, at *27 (Del. Ch. Sept. 8, 2004) (explaining that "the price actually derived from the sale of a company as a whole . . . may be considered as long as synergies are excluded"); *see also Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991) (commenting in an entire fairness case that "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair").

"fair value" from the court to the private parties. Also, while it is difficult for the Chancellor and Vice Chancellors to assess wildly divergent expert opinions regarding value, inflexible rules governing appraisal provide little additional benefit in determining "fair value" because of the already high costs of appraisal actions. . . . Therefore, we reject . . . [the] call to establish a rule requiring the Court of Chancery to defer to the merger price in any appraisal proceeding.

*Golden Telecom, Inc. v. Glob. GT LP (Golden Telecom II)*, 11 A.3d 214, 217-18 (Del. 2010) (footnotes omitted).

Since *Golden Telecom II*, and consistent with the Delaware Supreme Court's teaching in that decision, the Court of Chancery has considered the deal price as one of the "relevant factors" when determining fair value.[12] In at least five decisions, the Court

---

[12] *See Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771 (Del. Ch. Oct. 21, 2015); *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443 (Del. Ch. June 30, 2015); *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417 (Del. Ch. Apr. 30, 2015); *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726 (Del. Ch. Jan. 30, 2015); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807 (Del. Ch. Nov. 1, 2013). Court of Chancery decisions took the same approach before *Golden Telecom*. *See Highfields Capital*, 939 A.2d at 59 (deferring to the merger price where an arms' length process was conducted, and no material impediments prevented another bidder from entering the sale process during an eight-month market check period); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 358 (Del. Ch. 2003) (Strine, V.C.) (holding that the merger price was the best indication of fair value for purposes of an appraisal because the merger "resulted from a competitive and fair auction, which followed a more-than-adequate sales process and involved broad dissemination of confidential information to a large number of prospective buyers"); *see also Van de Walle*, 1991 WL 29303, at *17 (holding in breach of fiduciary duty case that "[t]he most persuasive evidence of the fairness of the . . . merger price is that it was the result of arm's length-negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available").

of Chancery has found the deal price to be the most reliable indicator of the company's fair value, particularly when other evidence of fair value was weak.[13]

Depending on the facts of the case, a variety of factors may undermine the potential persuasiveness of the deal price as evidence of fair value. For one, in a public company merger, the need for a stockholder vote, regulatory approvals, and other time-intensive steps may generate a substantial delay between the signing date and the closing date. The deal price provides a data point for the market price of the company as of the date of signing, but as discussed above, the valuation date for an appraisal is the date of

---

[13] *BMC*, 2015 WL 6164771, at *18 (finding merger price to be best indicator of value because of the "uncertainties in the DCF analysis" and because there was an "arm's-length transaction negotiated over multiple rounds of bidding among interested buyers"); *Ramtron*, 2015 WL 4540443, at *20 (finding merger price to be the most reliable evidence of value after deeming management forecasts unreliable and noting that "[a]ny impediments to a higher bid resulted from Ramtron's operative reality, not shortcomings of the Merger process"); *AutoInfo,* 2015 WL 2069417, at *17-18 (deferring to merger price after finding projections unreliable in the context of a "competitive and fair auction"); *Ancestry.com*, 2015 WL 399726, at *23 (finding merger price to be best indicator of value because of weak forecasts and a "robust" sale process); *CKx*, 2013 WL 5878807, at *13 (finding that the merger price was the "most reliable indicator of value" in a case "where no comparable companies, comparable transactions, or reliable cash flow projections exist"). Unlike the current case, none of these decisions involved an MBO. And unlike the current case, reliable projections and persuasive evidence of a significant valuation gap did not exist. In *BMC*, the court found that "the sales process was sufficiently structured to develop fair value of the Company," which is different than the facts of this case. 2015 WL 6164771, at *16. All the cases either involved a more active pre-signing market check or the process was kicked off by an unsolicited third-party bid.

closing. *See* Part II, *supra*. Market pricing indications can change rapidly, whether in the stock market or the deal market.[14]

Another issue is the reality that the M&A market for an entire company has different and less confidence-promoting attributes than the public trading markets:

> Among the other requirements for market efficiency are liquidity and fungibility. Public stock market prices are generally efficient because large numbers of identical shares of stock in a given company trade on a highly liquid market with millions of participants. The deal market, however— dealing as it does with entire companies, rather than individual shares— often lacks both qualities. No two companies are exactly alike, and the market for whole companies is unavoidably chunky, rather than liquid. As such, the deal market is unavoidably less efficient at valuing entire companies (including the value of control) than the stock market is at valuing minority shares.[15]

---

[14] In the *Dollar Thrifty* litigation, Chief Justice Strine (then a Vice Chancellor) noted that the price of Dollar Thrifty, the target company, rose from $26.97 in December 2009 to $38.85 in April 2010, with no other fundamental changes in its outlook except for the possibility of an M&A deal. *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 611-12 (Del. Ch. 2010). He commented that "if the stock market is actually pricing Dollar Thrifty on its future expected cash flows, the market has had a rather rapidly shifting sense of what those future cash flows are." *Id.* During the fifty-two weeks before news of the Merger leaked, the Company's stock price varied within a range which, in percentage terms, was more than twice as wide as in *Dollar Thrifty*, trading between a low of $8.86 and a high of $18.32 per share.

[15] Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 Del. J. Corp. L. (forthcoming 2016) (manuscript at 50), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2712088 [hereinafter Modern Appraisal Litigation]; *accord* James R. Repetti, *Management Buyouts, Efficient Markets, Fair Value, and Soft Information*, 67 N.C. L. Rev. 121, 128-37 (1988) (distinguishing between the "first tier" market for shares and the "second tier" market for corporate control; collecting studies indicating that the market for control is less efficient than the market for shares and that the divergence is pronounced for MBOs; arguing as a result that deal price is therefore an unreliable measure of fair value in MBO transactions).

The limitations on efficient pricing in the market for corporate control "are especially pronounced in the context of MBOs." Iman Anabtawi, *Predatory Management Buyouts*, 49 U.C. Davis L. Rev. 1285, 1320 (2016).

Writing as a Vice Chancellor, Chief Justice Strine observed that even for purposes of determining the value of individual shares, where the stock market is typically thick and liquid, the proponents of the efficient capital markets hypothesis no longer make the strong-form claim that the market price actually determines fundamental value; at most they make the semi-strong claim that market prices reflect all available information and are efficient at incorporating new information.[16] The M&A market has fewer buyers and

---

[16] *Dollar Thrifty*, 14 A.3d at 611 (citing Michael L. Wachter, *Takeover Defenses When Financial Markets Are (Only) Relatively Efficient*, 161 U. Pa. L. Rev. 787, 792 (2003) ("Specifically, when financial markets are relatively efficient, while investors cannot expect to outperform the market on an ongoing basis, individual stock prices can still be incorrect at any point in time—either under- or overestimating the value of the corporation." (citing John Y. Campbell, Andrew W. Lo & A. Craig Mackinlay, *The Econometrics of Financial Markets* 24–25 (Princeton Univ. Press, 1997)))); Anabtawi, *supra*, at 1301 ("Stock market prices can depart substantially from their fundamental value for extended periods of time."); Richard A. Brealey & Stewart C. Meyers, *Principles Of Corporate Finance* 368 (9th ed. 2008) ("[M]ost of the tests of market efficiency are concerned with *relative* prices and focus on whether there are easy profits to be made. It is almost impossible to test whether stocks are *correctly valued*, because no one can measure true value with any precision."); Lynn A. Stout, *Inefficient Markets and the New Finance* 7 (Univ. of Cal. L.A., Research Paper No. 05–11, 2005), *available at* http://ssrn.com/abstract=729224 ("[I]n a world of disagreement we must question whether securities markets can be efficient in a fundamental value sense. As noted earlier, however, fundamental value efficiency is not the only possible understanding of efficiency. Many theorists who speak of 'efficient markets' seem to be relying on the alternate idea of informational efficiency—that prices respond so quickly to new information it is impossible for traders to make profits on the basis of the information. Indeed, it has become common for finance economists whose faith in fundamental value-efficiency has been beaten out of them by market events and the accumulating evidence on anomalies to retreat to this intellectual position [Brealey & Meyers (2000, p. 377);

one seller, and the dissemination of critical, non-public due diligence information is limited to participants who sign confidentiality agreements. It is therefore erroneous to "conflate the stock market (which is generally highly efficient) with the deal market (which often is not)." Modern Appraisal Litigation, *supra,* at 50. It is perhaps more erroneous to claim that the thinner M&A market generates a price consistent with fundamental efficiency, when the same claim is no longer made for the thicker markets in individual shares.

There is also the recognized problem that an arms' length deal price often includes synergies. This can be true even for a financial buyer, because "the aggregation of shares, which eliminates agency costs in the process, is a value-creating transaction." Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts,* 50 B.C. L. Rev. 1021, 1050 (2009). The value of synergies "would not otherwise exist in the enterprise itself" and therefore represent an "'element of value arising from the accomplishment or expectation of the merger or consolidation' that must

---

Malkiel (1999, p. 270–74)]. It is important to understand that when economists define market efficiency in terms of the difficulty of making arbitrage profits, they have abandoned the intoxicating and powerful claim that efficient markets produce accurate prices. A market can respond near-instantaneously to new information without producing prices that mirror fundamental value." (brackets in original)); Lynn A. Stout, *The Mechanisms of Market Inefficiency,* 28 J. Corp. L. 635, 650 (2003) ("[O]nce we recognize that the concept of fundamental value efficiency depends not only on the [efficient capital market hypothesis] but also on some asset pricing model, most commonly CAPM, and that the CAPM itself is premised on investor homogeneity, the argument that efficient market prices reflect the best possible estimates of securities' future risks and returns is in a shambles. Fundamental value efficiency is a theoretical rabbit pulled out of a hypothetical hat."). *See generally, e.g.*, John Cassidy, *How Markets Fail* (2009); Justin Fox, *The Myth of the Rational Market* (2009).

be excluded" *Id.* at 1029 (quoting 8 *Del. C.* § 262). Consequently, "the appraisal statute requires that the Court exclude any synergies present in the deal price—that is, value arising solely from the deal." *BMC*, 2015 WL 6164771, at *14.

These three factors suggest that even with a public company target, deal price will not inevitably equate to fair value. It could be higher or lower. Doubtless other factors, some of which favor the deal price and others which cut against it, will emerge from academic research and through case-by-case development. The respondent corporation still may be able to establish that the merger price is the best evidence of fair value—and it often will be—but the corporation must carry its burden on that point. *See Golden Telecom II*, 11 A.2d at 217-18.

### 2.    The Appraisal Inquiry Contrasted With The Breach Of Fiduciary Duty Inquiry

An equally important consideration when evaluating the persuasiveness of the deal price for establishing fair value is the nature of the court's review of the process that led to the transaction. Here, the distinction between a breach of fiduciary duty case and an appraisal proceeding looms large:

> [W]hile the transaction particulars undergirding appraisal are related to and can sometimes overlap with those relevant to the fiduciary duty class action, the emphasis is crucially different. In a fiduciary duty class action, the court is faced with the question of holding individual directors personally liable for having breached their duties to the stockholders. Courts are naturally and properly hesitant to take such a drastic step lest directors become risk-averse, making decisions with an eye toward minimizing the risk of personal liability rather than seeking to maximize expected value for stockholders. An appraisal action asks a substantially more modest question: did the stockholders get fair value for their shares in the merger? If not, the acquirer must make up the difference, but no one is held personally liable.

Modern Appraisal Litigation, *supra*, at 48 (footnote omitted). The two inquiries are different, so a sale process might pass muster for purposes of a breach of fiduciary claim and yet still generate a sub-optimal process for purposes of an appraisal.

The central question in a breach of fiduciary duty case is whether the defendant fiduciaries acted in a manner that should subject them personally to a damages award. To determine whether a breach of duty occurred, a court applying Delaware law evaluates the directors' conduct through the lens of a standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). "Enhanced scrutiny is Delaware's intermediate standard of review." *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 43 (Del. Ch. 2013).

Framed for purposes of an M&A transaction, enhanced scrutiny places the burden on the defendant directors to show that they sought "to secure the transaction offering the best value reasonably available for the stockholders." *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1994). In this formulation, "[t]he key verb is 'sought.' Time-bound mortals cannot foresee the future. The test therefore cannot be whether, with hindsight, the directors actually achieved the best price." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011). "Rather, the duty can only

be to try in good faith, in such a setting, to get the best available transaction for the shareholders. Directors are not insurers."[17]

To determine whether directors have satisfied their fiduciary duties in an M&A setting, the enhanced scrutiny standard of review examines (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision," and (ii) "the reasonableness of the directors' action in light of the circumstances then existing." *QVC*, 637 A.2d at 44. "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty*, 14 A.3d at 598. The reasonableness standard enables a reviewing court "to address inequitable action even when directors may have subjectively believed that they were acting properly." *Del Monte*, 25 A.3d at 830-31. The objective standard does not permit a reviewing court to freely substitute its own judgment for the directors':

---

[17] *Citron v. Fairchild Camera & Instrument Corp.*, 1988 WL 53322, at \*16 n.17 (Del. Ch. May 19, 1988) (Allen, C.); *accord Dollar Thrifty*, 14 A.3d at 617 (expressing skepticism about an approach that would require directors to predict the future); *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at \*14 (Del. Ch. Aug. 8, 1988) (Allen, C.) ("*Revlon* explicitly recognized that a disinterested board acting in good faith and in an informed manner may enter into lock-up agreements if the effect was to promote, not impede, shareholder interests. (That can only mean if the *intended* effect is such, for the validity of the agreement itself cannot be made to turn upon how accurately the board did foresee the future).").

There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC*, 637 A.2d at 45 (emphasis removed). Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005); *accord Dollar Thrifty*, 14 A.3d at 595-96 ("[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there.").

As these passages show, enhanced scrutiny requires an inquiry into the ends the directors pursued and the means they chose to achieve them. "[T]he reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e. is it acting for the proper ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends." *Dollar Thrifty*, 14 A.3d at 599. Enhanced scrutiny "mandates that the court look closely at the motivations of the board." *Id.* at 598. What typically generates a finding of breach "is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process." *Del Monte*, 25 A.3d at 831. The test is not whether the outcome was in fact the best

transaction reasonably available, and the failure to achieve what actually would have been the best transactional outcome, standing alone, is not a basis for liability. The outcome that the directors achieved will figure into the damages calculation, but only if the matter reaches that phase. The outcome is not part of the liability case.

In an appraisal proceeding, by contrast, the opposite is true. The court does not judge the directors' motives or the reasonableness of their actions, but rather the outcome they achieved. The price is all that matters because the court's inquiry focuses exclusively on the value of the company. How and why the directors achieved fair value or fell short is not part of the case. The sale process is useful to the extent—and only to the extent—that it provides evidence of the company's value on the date the merger closed.

Because the standards differ, it is entirely possible that the decisions made during a sale process could fall within *Revlon*'s range of reasonableness, and yet the process still could generate a price that was not persuasive evidence of fair value in an appraisal.[18] Put

_____

[18] *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at \*16 (Del. Ch. Jan. 30, 2015) ("Of course, a conclusion that a sale was conducted by directors who complied with their duties of loyalty is not dispositive of the question of whether that sale generated fair value."); *In re Appraisal of Orchard Enters., Inc.*, 2012 WL 2923305, at \*5 (Del. Ch. July 18, 2012) (Strine, C.) ("[T]his is an appraisal action, not a fiduciary duty case, and although I have little reason to doubt Orchard's assertion that no buyer was willing to pay Dimensional $25 million for the preferred stock and an attractive price for Orchard's common stock in 2009, an appraisal must be focused on Orchard's going concern value.").

differently, even if a transaction passes fiduciary muster, an appraisal proceeding could result in a higher fair value award.[19]

> To be sure, the questions in the two kinds of actions are frequently related. Often, when stockholders do not get fair value for their shares, it will be because the board has breached its fiduciary duties. . . . [T]he strongest appraisal claims [should] also present strong fiduciary duty claims, and vice versa. But forcing both types of claims into the same analytical box is a self-evident mistake. Many types of managerial sloth, incompetence, pressure, or collusion that courts have been understandably hesitant to characterize as breaches of fiduciary duty can nonetheless lead to . . . stockholders receiving well below fair value for their shares. In such situations, appraisal constitutes a useful middle course between holding directors personally liable (and potentially granting injunctions) and allowing unfair transactions to escape meaningful scrutiny.

Modern Appraisal Litigation, *supra*, at 48. "Satisfying one of the various *Revlon*-type tests . . . is not necessarily a market test" sufficient to establish fair value for purposes of appraisal. Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U.L. Rev. 1551, 1608 (2015).

---

[19] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A fair merger price in the context of a breach of fiduciary duty claim will not always be a fair value in the context of determining going concern value."); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 30 (Del. Ch. 2014) ("A price may fall within the range of fairness for purposes of the entire fairness test even though the point calculation demanded by the appraisal statute yields an award in excess of the merger price."); *Trados II*, 73 A.3d at 78 ("A court could conclude that a price fell within the range of fairness and would not support fiduciary liability, yet still find that the point calculation demanded by the appraisal statute yields an award in excess of the merger price."); *Reis*, 28 A.3d at 466 ("A court readily could conclude that a price fell within the range of fairness and would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price."). *Compare Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1176-77 (Del. 1995) (affirming that merger consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 30 (Del. 2005) (awarding fair value in appraisal of $28.41 per share).

### 3.    MBO Status As An Additional Factor

A third factor when considering the persuasiveness of the deal price is the fact that the Merger was an MBO. Because of management's additional and conflicting role as buyer, MBOs present different concerns than true arms' length transactions. A vast amount of case law[20] and scholarship (both legal[21] and empirical[22]) has addressed MBOs.

---

[20] In Delaware, seminal cases addressing challenges to MBOs on fiduciary grounds include the Delaware Supreme Court's decisions in *Revlon* and *Macmillan* and Chancellor Allen's decisions in *Fort Howard* and *RJR Nabisco*. *See Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del. 1989); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 713 (Del. 1986); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036 (Del. Ch. Jan. 31, 1989); *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147 (Del. Ch. Aug. 8, 1988). More recent treatments include a series of opinions authored by Chief Justice Strine while serving as a member of this court. *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94 (Del. Ch. 2007); *In re Topps Co. S'holders Litig.*, 926 A.2d 58 (Del. Ch. 2007); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171 (Del. Ch. 2007). This court's rejection of a settlement in *SS&C Technologies* likewise identifies some of the complications raised by an MBO. *See In re SS&C Techs., Inc.*, 911 A.2d 816, 820-22 (Del. Ch. 2006) (rejecting as inadequate a proposed settlement of breach of fiduciary duty claims challenging an MBO; identifying issues that plaintiffs' counsel failed to address adequately).

[21] A number of authorities are cited in this decision. There are many others. *See, e.g.*, Tom Ablum & Mary Beth Burgis, *Leveraged Buyouts: The Ever Changing Landscape*, 13 DePaul Bus. L.J. 109 (2001); William T. Allen, *Independent Directors In MBO Transactions: Are They Fact or Fantasy?*, 45 Bus. Law. 2055 (1990); Jason M. Klein, *When the Board Should Just Say Yes to Management: The Interplay Between the Decision of Whether to Conduct an Auction and Transaction Structure*, 5 Stan. J.L. Bus. & Fin. 45 (1999); Louis Lowenstein, *Management Buyouts*, 85 Colum. L. Rev. 730 (1985); Dale Arthur Oesterle & Jon R. Norberg, *Management Buyouts: Creating or Appropriating Shareholder Wealth*, 41 Vand. L. Rev. 207 (1988); Bill Shaw, *Resolving the Conflict of Interest in Management Buyouts*, 19 Hofstra L. Rev. 143 (1990); David B. Simpson, *The Management Buyout: An Idea Whose Time May Have Passed*, 17 Seton Hall Legis. J. 137 (1993).

[22] The economic literature on stockholder returns in MBOs through 2011 is surveyed helpfully in Matthew D. Cain & Steven M. Davidoff, *Form Over Substance?*

60

Although the literature is far from unanimous in its analysis and policy recommendations,[23] the weight of authority suggests that a claim that the bargained-for price in an MBO represents fair value should be evaluated with greater thoroughness and care than, at the other end of the spectrum, a transaction with a strategic buyer in which management will not be retained.

### 4. The Sale Process In This Case

In this case, the Company's process easily would sail through if reviewed under enhanced scrutiny. The Committee and its advisors did many praiseworthy things, and it would burden an already long opinion to catalog them. In a liability proceeding, this court could not hold that the directors breached their fiduciary duties or that there could be any basis for liability. But that is not the same as proving that the deal price provides the best evidence of the Company's fair value. In this case, a combination of factors undercut the

---

*The Value of Corporate Process and Management Buy-Outs*, 36 Del. J. Corp. L. 849, 867-71 (2011). Cain and Davidoff also provide empirical evidence of their own.

[23] *Compare* Yakov Amihud, *Leveraged Management Buyouts and Shareholders' Wealth*, *in Leveraged Management Buyouts: Causes and Consequences* 3, 24 (Yakov Amihud ed., 1989) (concluding that MBOs increase shareholders' wealth by increasing stock prices), *with* Robert L. Kieschnick, Jr., *Management Buyouts of Public Corporations: An Analysis of Prior Characteristics*, *in Leveraged Management Buyouts: Causes and Consequences* 35, 57 (Yakov Amihud ed., 1989) (concluding that the benefit of MBOs cannot be established), *with* Kai Chen, Yong-Cheol Kim & Richard D. Marcus, *Hands in the Cookie Jar? The Case of Management Buyouts* 28 (2009) (finding evidence that management acts opportunistically in MBOs but that effect is mitigated by option holdings), *available at* http://ssrn.com/abstract=1364655, *published in* 3 Int'l Rev. Acct., Banking & Fin. 19 (2011).

relationship between the Final Merger Consideration and fair value, undermining the persuasiveness of the former as evidence of the latter.

### a.     The Pre-Signing Phase

The sale process in this case had two phases: (i) a pre-signing phase and (ii) a post-signing go-shop period. The Original Merger Consideration was the product of the pre-signing phase, and the evidence established that it was below fair value. Three factors contributed to this outcome: (i) the use of an LBO pricing model to determine the Original Merger Consideration, which had the effect in this case of undervaluing the Company, (ii) the compelling evidence of a significant valuation gap driven by the market's short-term focus, and (iii) the lack of meaningful pre-signing competition.

### i.     The LBO Pricing Model

The first factor that undermined the persuasiveness of the Original Merger Consideration was the use of an LBO pricing model. Delaware case law recognizes that the highest price a bidder is willing to pay is not the same as fair value. *See, e.g.*, *Appraisal of Orchard*, 2012 WL 2923305, at *5. Although the Delaware Supreme Court has recognized that "[a] merger price resulting from arms-length negotiations . . . is a very strong indication of fair value," it has also cautioned that the merger price "must be accompanied by evidence tending to show that it represents the going concern value of the company rather than just the value of the company to one specific buyer." *M.P.M. Enters.*, 731 A.2d at 797. The fact that a board has extracted the most that a particular buyer (or type of buyer) will pay does not mean that the result constitutes fair value.

In this case, the Committee only engaged during the pre-signing phase with financial sponsors. When proposing an MBO, a financial sponsor determines whether and how much to bid by using an LBO model, which solves for the range of prices that a financial sponsor can pay while still achieving particular IRRs.[24] What the sponsor is willing to pay diverges from fair value because of (i) the financial sponsor's need to achieve IRRs of 20% or more to satisfy its own investors and (ii) limits on the amount of leverage that the company can support and the sponsor can use to finance the deal.[25] Although a DCF methodology and an LBO model use similar inputs, they solve for different variables: "[T]he DCF analysis solves for the present value of the firm, while the LBO model solves for the internal rate of return." Donald M. DePamphilis, *Mergers, Acquisitions, and Other Restructuring Activities* 506 (7th ed. 2014). The Company concedes that an LBO model is not "oriented toward solving for enterprise value." Dkt. 373 at 27. Sell-side financial advisors can use an LBO model to predict with a high

---

[24] *See* Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions* 195-96 (2009) ("[An LBO model] is used . . . to determine an implied valuation range for a given target in a potential LBO sale based on achieving acceptable returns. . . .").

[25] *Id.* at 235-36 ("Traditionally, the valuation implied by LBO analysis is toward the lower end of a comprehensive analysis when compared to other methodologies, particularly precedent transactions and DCF analysis. This is largely due to the constraints imposed by an LBO, including leverage capacity, credit market conditions, and the sponsor's own IRR hurdles.")

degree of accuracy the range of offers that a target corporation can expect from financial sponsors.[26]

The factual record in this case demonstrates that the price negotiations during the pre-signing phase were driven by the financial sponsors' willingness to pay based on their LBO pricing models, rather than the fair value of the Company. JPMorgan, Goldman, and Evercore advised the Committee that the financial sponsors would determine how much to pay by solving for their required IRRs using an LBO pricing model. In an October 2012 presentation to the Committee, JPMorgan advised the Committee that

- "Financial buyers evaluate investments with an internal rate of return (IRR) analysis, which measures return on equity";

- "Multiple of cash invested (e.g. 2.0x) is also a key parameter, particularly for larger transactions";

- "IRR will be used as the primary means to determine the appropriate purchase price by a sponsor. . . ."

JX 137 at 19. JPMorgan did not anticipate competition from strategic bidders and told the Committee that "there was a low probability of strategic buyer interest in acquiring the Company." JX 137 at 3. When making its initial presentations to the Committee, JPMorgan did not include the results of its LBO pricing model in the football field of

---

[26] Rosenbaum & Pearl, *supra*, at 195-96 ("In an M&A sell-side advisory context, the banker conducts LBO analysis to assess valuation *from the perspective of a financial sponsor*. This provides the ability to set sale price expectations for the seller and guide negotiations with buyers accordingly. . . ." (emphasis added)).

valuation observations, which was consistent with the fact that an LBO pricing model does not solve for fair value. JX 162 at 15.

Using the same set of projections for both a DCF analysis and an LBO analysis, JPMorgan showed why a financial sponsor would not be willing to pay an amount approaching the Company's going-concern value. Using the September Case and a DCF analysis, JPMorgan valued the Company as a going concern at between $20 and $27 per share. But using the *same projected cash flows* in an LBO model, JPMorgan projected that a financial buyer's willingness to pay would max out at approximately $14.13 per share, because at higher prices, the sponsor could not achieve a minimum return hurdle of a 20% IRR over five years. That $14.13 figure also assumed the sponsor engaged in further recapitalizations of the Company. Assuming a financial sponsor wanted to achieve IRRs in the range of 20% to 25%, JPMorgan placed the likely range of prices at $11.75 to $13.00, or $13.25 to $14.25 if the sponsor engaged in further recapitalizations of the Company.

Even if a financial sponsor was willing to accept a lower IRR such that it "could have" paid more for the Company, JPMorgan concluded that an MBO "would not have been possible for the company" at prices of $19 or more because it would require a level of leverage "that you could not get in the marketplace." Rajkovic Dep. 106-07. The issue was not whether the financial sponsors credited management's projections. As JPMorgan's analysis showed, the very same projections generated lower prices when run through an LBO model than when analyzed using a DCF analysis.

The factual record established that the financial sponsors behaved as the Committee's advisors' predicted. When Silver Lake and KKR provided their initial expressions of interest, they bid at the low end of what the LBO model suggested. Silver Lake proposed an all-cash transaction valued at between $11.22 and $12.16 a share, excluding shares held by Mr. Dell, and KKR proposed an all-cash transaction valued at between $12.00 and $13.00 a share, excluding shares held by Mr. Dell and Southeastern. The financial sponsors opened at levels that gave them room to negotiate, while staying within the pricing parameters of their models.

When advising the Committee about what to do next, JPMorgan recognized that financial sponsors use similar LBO models. JPMorgan told the Committee in December 2012 that "given comparable LP make-up and return hurdles," it was "unlikely to see any material difference" between Silver Lake's offer and what other financial sponsors would pay. JX 226 at 22. When Evercore joined the sell-side team in January, it came to similar conclusions. At trial, JPMorgan's lead banker confirmed that LBO shops use essentially the same model.[27] In other words, the outcome of competition between financial sponsors

_____

[27] Tr. 751: (Rajkovic) ("Q. So among the big boys in private equity, and I know you don't want to hear this, they basically have the same models, the same hurdle rates, the same returns and, in fact, often the same clients. Correct? A. They come fairly close unless - they come fairly close in most situations. Yes they do."); Tr. 749-50 (Rajkovic) ("Q. And you guys have a lot of experience with LBOs there at JPMorgan. Right? A. We do. Q. And you know what kind of IRRs these firms try to achieve. Right? A. We do. Q. And you know the time frame at which they try to get out. Correct? A. We do. Q. And you know the leverage that they try to put on, both their ability to get the amount of leverage but also the amount of leverage they need to get certain returns. Correct? A. Yes. Q. And you took all that into account, and you said based on the September 21 most current management forecasts, with no inversions, that the implied maximum price to pay

primarily depends on their relative willingness to sacrifice potential IRR. It does not lead to intrinsic value.

As the pre-signing process unfolded, Silver Lake continued to base its bids on its LBO model. Durban agreed that Silver Lake determined what to bid using a model that calculated the maximum price Silver Lake could pay and still hit its IRR target. Silver Lake was "not concerned at all . . . with the intrinsic value analysis of the business." Durban Dep. 12. Silver Lake analyzed the Company's value only to "understand how [its] actual investment [would] perform." *Id.* Silver Lake similarly did not form any view about whether the market price of the Company's common stock reflected the Company's fair value as a going concern.

Mr. Dell did not focus on fair value either. He initially went along for the ride and agreed to invest his capital alongside Silver Lake at whatever price it was willing to pay. Tr. 465-467 (Mr. Dell). But when the Committee eventually insisted on $13.65 per share and Silver Lake balked, Mr. Dell agreed to invest at a lower valuation of $13.36 to make the higher price work for Silver Lake and preserve his control over the post-transaction entity.

Even the Committee did not focus on fair value. In the proxy statement, the directors disclosed that the "Committee did not seek to determine a pre-merger going

---

would be $14.13 in an LBO. Right? . . . A. Yes. Correct. Q. Okay. And so you basically told the board, 'Look, in an LBO, don't expect anything that's going to come in above that.' Right? A. We told them that using this model and with the assumptions around leverage and return, that is what value the model would indicate . . . ."); Rajkovic Dep. 108 ("Q. This isn't Michael Dell or Silver Lake[] specific? A. Just for anybody. . . .").

67

concern value for the Common Stock to determine the fairness of the merger consideration to the Company's unaffiliated stockholders." JX 532 at 71. The Committee instead negotiated based on a variety of metrics, including what the LBO models prepared by its financial advisors indicated was the most that Silver Lake would pay. As a practical matter, the Committee negotiated without determining the value of its best alternative to a negotiated acquisition.

After Silver Lake raised its bid to $12.90 per share in January 2013, Evercore calculated that if the Company performed consistent with the September Case, then at the price it was offering, Silver Lake would achieve a 5-year IRR of 45% and generate a 5.3x multiple on its invested capital, even if Silver Lake exited in five years at the same transaction multiple. Mr. Dell would achieve a 5-year IRR of 50.1% and generate a 6.2x multiple on his invested capital. Evercore calculated that if the Company performed consistent with the BCG 25% Case, which the Committee believed was most likely, then Silver Lake would achieve a 5-year IRR of 39.8% and generate a 4.5x multiple on its invested capital. Mr. Dell would achieve a 5-year IRR of 44.7% and generate a 5.3x multiple on his invested capital. After receiving this advice, the Committee advised the Board that it would "target a sale price of $13.75 per share, with $13.60 per share as the minimum sale price for agreeing to a deal." JX 315 at 2. Silver Lake eventually offered $13.65 per share, which the Committee accepted.

This was not a case in which the Buyout Group intended to make changes in the Company's business, either organically or through acquisitions. The Buyout Group intended to achieve its returns simply by executing the Company's existing business

strategy and meeting its forecasted projections. Mr. Dell identified for the Committee the strategies that he would pursue once the Company was private, and the record establishes that all of them could have been accomplished in a public company setting. BCG recognized and advised the Committee that the *only* benefits Mr. Dell could realize by taking the Company private that were not otherwise available as a public company were (i) accessing offshore cash with less tax leakage (to pay down the acquisition debt) and (ii) arbitraging the value of the Company itself by buying low and selling high.[28]

Taken as a whole, the foregoing evidence, along with other evidence in the record, establishes that the Original Merger Consideration was dictated by what a financial sponsor could pay and still generate outsized returns. This fact is a strong indication that the Original Merger Consideration undervalued the Company as a going concern.

---

[28] JX 229 at 60. Academic scholarship suggests this is true of private equity deals more broadly. *See* Steven N. Kaplan & Per Strömberg, *Leveraged Buyouts and Private Equity*, 23 J. Econ. Perspectives 121, 122 (2009) ("[T]here is also evidence consistent with private equity investors taking advantage of market timing (and market mispricing) between debt and equity markets particularly in the public-to-private transactions of the last 15 years."); *id.* at 136 ("[P]rivate equity firms pay lower premiums than public company buyers in cash acquisitions. These findings are consistent with private equity firms identifying companies or industries that turn out to be undervalued. Alternatively, this could indicate that private equity firms are particularly good negotiators, and/or that target boards and management do not get the best possible price in these acquisitions."); *id.* at 135-36 ("[P]ost-1980s public-to-private transactions experience only modest increases in firm operating performance, but still generate large financial returns to private equity funds. This finding suggests that private equity firms are able to buy low and sell high.").

### ii. The Valuation Gap

A second factor that undermined the persuasiveness of the Original Merger Consideration as evidence of fair value was the widespread and compelling evidence of a valuation gap between the market's perception and the Company's operative reality. The gap was driven by (i) analysts' focus on short-term, quarter-by-quarter results and (ii) the Company's nearly $14 billion investment in its transformation, which had not yet begun to generate the anticipated results. A transaction which eliminates stockholders may take advantage of a trough in a company's performance or excessive investor pessimism about the Company's prospects (a so-called anti-bubble). Indeed, the optimal time to take a company private is after it has made significant long-term investments, but before those investments have started to pay off and market participants have begun to incorporate those benefits into the price of the Company's stock.[29] In *Glassman v. Unocal*

---

[29] *See* Cain & Davidoff, *supra*, at 862 ("There is a more concrete argument against MBOs on fairness grounds. It is the prospect that management is utilizing inside information when it arranges an MBO. Management by its inherent position has in its possession non-public knowledge of the corporation, and management can use this informational asymmetry between itself and public shareholders to time the buy-out process. MBOs can thus be arranged at advantageous times in the business cycle or history of the corporation." (footnotes omitted)); Marcel Canoy, Yohanes E. Riyanto & Patrick van Cayseele, *Corporate Takeovers, Bargaining and Managers' Incentives to Invest*, 21 Managerial & Decision Econs. 1, 2, 14 (2000) ("Long-term investments, such as R&D investments, are slow yielding and more difficult to be evaluated by the market, despite the fact that they could generate higher profits. Consequently, firms investing heavily in long-term projects may be more susceptible to a takeover attempt. . . . If being taken over is better than taking over [for target management] . . . then obviously, [management] would like to overinvest to facilitate a takeover . . . ."); Deborah A. DeMott, *Directors' Duties in Management Buyouts and Leveraged Recapitalizations*, 49 Ohio St. L.J. 517, 536 (1988) (explaining that overhang from past acquisitions may artificially depress a company's stock market price and make the buyout price appear

*Exploration Corp.*, 777 A.2d 242 (Del. 2001), the Delaware Supreme Court

acknowledged that an appraisal proceeding can and should address the problem of

opportunistic timing:

> The determination of fair value must be based on *all* relevant factors,
> including damages and elements of future value, where appropriate. So, for
> example, if the merger was timed to take advantage of a depressed market,
> or a low point in the company's cyclical earnings, or to precede an
> anticipated positive development, the appraised value may be adjusted to
> account for those factors.

*Id.* at 248; *cf. Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 314-15

(Del. Ch. 2006) (Strine, V.C.) ("Obviously, when a business has opened a couple of

facilities and has plans to replicate those facilities as of the merger date, the value of its

expansion plans must be considered in determining fair value. To hold otherwise would

---

generous); Repetti, *supra*, at 125 ("Other methods for management to realize large gains in management buyouts are not as innocuous as the use of leverage or as apparently innocuous as increasing cash flow. Management may actively depress the price of the shares prior to the management buyout in order to reduce the price they have to pay. Management may accomplish this by . . . channeling investments into long-term projects which will not provide short-term returns."); James Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right*, 77 Harv. L. Rev. 1189, 1202-03 (1964) ("Far more difficult is ensuring to departing stockholders the benefit of improved prospects, where, at the time of appraisal, the evidence of improvement is more intuitive than tangible. . . . The appraisal process will tend to produce conservative results where the values are speculative, and the majority's power to pick the time at which to trigger appraisal may encourage them to move when full values may be temporarily obscured." (footnote omitted)); *see also* Benjamin Hermalin & Alan Schwartz, *Buyouts in Large Companies*, 25 J. Legal Stud. 351, 356 (1996) ("With respect to timing, the firm could initiate a freeze-out (i) before it invests effort, (ii) after it invests effort but before the value of the firm conditional on effort is revealed, or (iii) after the value of the firm is revealed but before earnings are realized. We generally assume that the firm would wait until point iii because waiting in the model is costless but produces gains: were the firm to initiate a freeze-out before it learns its value, it might have to pay too much.").

be to subject our appraisal jurisprudence to just ridicule. The dangers for the minority arguably are most present when the controller knows that the firm is on the verge of break-through growth, having gotten the hang of running the first few facilities, and now being well-positioned to replicate its success at additional locations—think McDonald's or Starbucks.").

Proposing an MBO when the stock price is low has the further effect of using the depressed stock price to anchor price negotiations.[30] Empirical evidence confirms the experiential insight that both targets and acquirers use the market price of the target's stock as a reference point in formulating a bid.[31] When a company with a depressed

---

[30] David A. Lax & James K. Sebenius, *3-D Negotiation: Powerful Tools to Change in Your Most Important Deals* 189 (2006) ("[I]n [the] auction setting, higher anchors—in the form of minimum bid prices—tend to increase the valuation bidders place on the objection being auctioned."); G. Richard Shell, *Bargaining For Advantage* 159 (1999) (explaining that the "anchor and adjustment effect . . . refers to a human tendency to be affected by 'first impression' numbers thrown into our field of vision [and] [w]e tend to make adjustments from these often arbitrary reference points"); Guhan Subramanian, *Negotiauctions* 16-18 (2010) (explaining that anchoring "works by influencing your perceptions of where the [zone of possible agreement] lies").

[31] Malcom Baker, Xin Pan, & Jeffery Wurgler, *The Effect of Reference Point Prices on Mergers and Acquisitions*, 106 J. Fin. Econ. 49, 50 (2012) (finding the "26-week high price [of a particular stock] has a statistically and economically significant effect on offer prices [in mergers and acquisitions], and the 39-, 52-, and 65-week high prices also have independent explanatory power" and speculating as to the causes of this reference point effect); *id.* at 64-65 (finding that deals with higher premiums tend to close more often, which is "consistent with reference point behavior."); Inga Chira & Jeff Madura, *Reference Point Theory and Pursuit of Deals*, 50 Fin. Rev. 275, 277, 299 (2015) ("Our analysis reveals that a higher target 52-week reference point, relative to the target's current stock price, . . . increases the likelihood of a management buyout (MBO). . . . Overall, the results from our analyses offer strong evidence that target and bidder reference points serve as potent anchors that shape the outcomes and structures of mergers."); Sangwon Lee & Vijay Yerramilli, *Relative Values, Announcement Timing,*

market price starts a sale process, the anchoring effect makes the process intuitively more likely to generate an undervalued bid. Market myopia can accentuate this problem.[32] Investors focused on short-term, quarterly results can excessively discount the value of long-term investments.[33]

The record at trial demonstrated that a significant valuation gap, investor myopia, and anchoring were all present in this case. Mr. Dell identified the opportunity to take the Company private after the stock market failed to reflect the Company's going concern value over a prolonged period. He managed the Company for the long-term and understood that his strategic decisions would drive the stock price down in the short-term.

---

*and Shareholder Returns in Mergers and Acquisitions* 2 (January 2016) (unpublished manuscript) (adopting finding of Baker, Pan, & Wurger, *supra*, that "key decision makers in the bidding and target firms and investors are likely to use recent prices as reference points").

[32] *See* Leo E. Strine, Jr., *One Fundamental Corporate Governance Question We Face: Can Corporations Be Managed for the Long Term Unless Their Powerful Electorates Also Act and Think Long Term?*, 66 Bus. Law. 1, 10 (2010) (noting that institutional investors "control nearly 70 percent of U.S. publicly traded equities" and "[f]or a variety of reasons, these institutional investors often have a myopic concern for short-term performance"); *see also* Martin Lipton, *Empiricism and Experience; Activism and Short-Termism; the Real World of Business*, Harv. L. Sch. Forum Corp. Gov. & Fin. Reg. (Oct. 28, 2013), https://corpgov.law.harvard.edu/2013/10/28/empiricism-and-experience-activism-and-short-termism-the-real-world-of-business/ (collecting studies supporting view that investors exert short-term pressures on corporations).

[33] *See* Martin Lipton & Marshall P. Shaffer, *Wachtell Lipton Discusses Short-Term Investors, Long-Term Investments, and Firm Value*, Colum. L. Sch. Blue Sky Blog (Feb. 3, 2016), http://clsbluesky.law.columbia.edu/2016/02/03/wachtell-lipton-discusses-short-term-investors-long-term-investments-and-firm-value/ (commenting on study suggesting that investors undervalue R&D investments and concluding that "short-term investors possess the undue ability to pressure companies into maximizing near-term gains at the expense of long-term growth").

The Company's management team recognized the valuation gap as early as January 2011, when they prepared a sum-of-the-parts analysis that valued the company at between $22.49 and $27.05 per share and its stock was trading around $14 per share. The Committee's advisors reached a similar conclusion. In October 2012, Dell's stock was trading between $9 and $10 per share, yet JPMorgan generated multiple valuation methodologies that implied a fundamental valuation exceeding that price, and its DCF analysis valued the Company at between $20 and $27 per share. Goldman contemporaneously observed that that its "[i]llustrative standalone valuation analyses result in [Dell] value outcomes that are significantly higher than the current share price." JX 170 at 4-6. BCG made the same observation, commenting that the Company's "low valuation does not match apparent company strengths and reflects investor concerns." JX 344 at 42 (emphasis removed).

It bears emphasizing that unlike other situations that this court has confronted,[34] there is no evidence that Mr. Dell or his management team sought to create the valuation

---

[34] *See, e.g.*, *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *27 (Del. Ch. Aug. 27, 2015) (finding that defendant fiduciaries engaged in "a calculated effort to depress the market price" as part of a plan to take the company private (quotation marks omitted)); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *32 (Del. Ch. May 3, 2004) ("Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and 'flipped' the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the 'floor' for the equally depressed and unfair Privatization price . . . ."); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (finding the defendants engaged in a "calculated effort to depress the price of Sealy until the minority stockholders were eliminated by merger or some other form of acquisition" and that "[s]uch behavior by a majority stockholder constitutes unfair dealing").

74

disconnect so that they could take advantage of it. To the contrary, they tried to convince the market that the Company was worth more. Only when the gap persisted despite their efforts, and after both Southeastern and Silver Lake suggested the possibility of an MBO to Mr. Dell, did he eventually decide to pursue the opportunity that the market price was presenting.

As Mr. Dell and the Committee's advisors recognized, the valuation gap existed because Dell's stockholders were focused on the short-term. Mr. Dell made clear that he was investing in the Company for the long-term. The Company spent nearly $14 billion in acquisitions in the three years preceding the Merger as part of Mr. Dell's transformation strategy. Mr. Dell told the Board that to "[e]xpect [the] short term to be very challenging" and that the transformation strategy would require "sacrific[ing] short term results." JX 96 at 2. He also believed the plan was working and would fuel long-term growth. Mr. Dell made the same points publicly. In May 2013, he explained at an analysts' conference that

> [i]n recent years, Dell has emerged as a new company. We have our strongest-ever product and services portfolio, and have acquired significant new skills and capabilities, reorganized our operations, optimized our global supply chain and put in place a world-class management team. . . . Today's Dell is a customer-inspired end-to-end solutions provider. One that has evolved from a PC manufacturer to a true IT solutions partner – one that offers a differentiated view of the enterprise.

JX 530 at 6. In September 2012, management again stressed that it was pursuing "a long-term strategy [that] will take time." JX 109 at 7. Mr. Dell stated: "We're transforming our business, not for a quarter or a fiscal year, but to deliver differentiated customer value for the long term." JX 110 at 1.

75

The Committee's advisors recognized the disconnect. In one presentation, JPMorgan noted that "[m]issed Street expectations have put investors in a 'wait and see mode' with increased focus on quarter-by-quarter execution and improved visibility." JX 137 at 7. In another, JPMorgan observed that "[l]imited visibility and missed Street expectations appear to have led to increased investor focus on near-term execution." JX 226 at 5. Goldman cited a series of reasons for the disconnect, including that

> Companies at the center of industries undergoing major structural changes often suffer from depressed valuations that seem "disconnected" from fundamentals
>
> – Many investors believe that the shift to mobile computing represents a significant disruption to the traditional desktop and "notebook" ecosystem
>
> – Investors are often reluctant to fight strong "secular headwinds" even when values become attractive in absolute and relative terms; as a result, valuations can remain depressed for protracted periods.

JX 170 at 6. BCG similarly observed that the Company's low valuation reflected "investor concerns." JX 344 at 42.

During the sale process, despite the Company's depressed and erratic stock price, the Committee and its advisors used the Company's market price as a key input. In fact, trading price was the only quantitative metric the Committee cited in the Company's proxy statements when explaining its recommendation that stockholders approve the Merger. The Committee noted that it had *not* considered net book value, comparable transactions, or "a pre-merger going concern value" because it believed "that the trading price of the Common Stock *at any given time* represents the best available indicator of the Company's going concern value at that time." JX 532 at 71 (emphasis added).

76

Accordingly, the proxy statement cited only metrics based on the trading price, including (i) the approximately 44% premium over the one-day trading price of $9.64 per share on November 11, 2012, they day before an analyst report first suggested that the Company might be a target for an LBO, (ii) the approximately 28% premium over the unaffected one-day trading price of $10.88 per share on January 11, 2013, the last trading day before media outlets leaked news of the Merger, and (iii) the approximately 39% premium over the average trading price of $9.97 per share during the ninety days preceding January 11. The Committee also cited the "the current and historical market prices of the Common Stock, including the market performance of the Common Stock relative to the common stock of other participants in the industries in which the Company operates and general market indices" as proof of the Final Merger Consideration's fairness. JX 654 at 57.

In the proxy statement, the Committee also cited its financial advisors' opinions. The summary of JPMorgan's work identified two DCF valuations: one derived from the BCG Base Case, which valued the Company at between $11.25 and $15.00 per share, and one derived from the BCG 25% Case, which valued the Company at between $13.00 and $17.50 per share.

But JPMorgan provided significantly more data for its market-based approaches, which included the Company's 52-week trading range, enterprise value as a function of the Company's EBITDA multiple using four sets of projections, and enterprise value as a function of the Company's earnings multiple using four sets of projections. JPMorgan also compared the premium over market to similar premiums offered in other large LBOs. Evercore relied almost entirely on the "non-DCF elements of [its] analysis,"

77

which were primarily market-based. Tr. 408 (Hiltz). They included the Company's 52-week trading range, analyst twelve-month price targets, the present value of the Company's future stock price, and comparisons of the Merger's premium over market to other large deals.

Taken as a whole, the foregoing evidence, along with other evidence in the record, establishes the existence of a significant valuation gap between the market price of the Company's common stock and the intrinsic value of the Company. The anti-bubble both facilitated the MBO and undermined the reliability of the market price as a measure of the Company's value. In reaching this finding, I recognize that "[t]here is virtually no CEO in America who does not believe that the market is not valuing her company properly." *Chesapeake Corp. v. Shore*, 771 A.2d 293, 327 (Del. Ch. 2000) (Strine, V.C.). In this case, however, the evidence of a significant valuation gap was both extensive and compelling.

### iii. Limited Pre-Signing Competition

A third factor that undermined the persuasiveness of the Original Merger Consideration as evidence of fair value was the lack of meaningful price competition during the pre-signing phase. Go-shops in MBO transactions rarely produce topping bids,[35] so the bulk of any price competition occurs before the deal is signed.[36] The

---

[35] Tr. 366 (Hiltz) ("[T]he mathematical chances of producing a higher bid [were] low based on the history of go-shops"); JX 301 at 19 (Evercore advising the Committee that "[s]ince 2005, there have been 137 transactions with equity values greater than $100 million with go-shop provisions" and that of those transactions, "only 16 or 12% resulted in a superior offer"); *see* Guhan Subramanian, *Go-Shops vs. No-Shops in Private Equity:*

78

competition does not have to be direct and overt; and the prospect of post-signing

---

*Deals Evidence & Implications*, 63 Bus. Law. 729, 750-51 (2008) [hereinafter *Go-Shops vs. No-Shops*] (finding that there is "no post-signing competition in go-shop MBOs during my sample period, consistent with practitioner wisdom that MBOs give incumbent managers a significant advantage over other potential buyers"); Brian JM Quinn, Omnicare*: Coercion and the New* Unocal *Standard*, 38 J. Corp. L. 835, 844 (2013) [hereinafter New *Unocal* Standard] ("A more pessimistic interpretation of the widespread adoption of go-shop provisions is that go-shop provisions are not truly effective at generating post-signing competition and that buyers understand as much."); J. Russel Denton, Note, *Stacked Deck: Go-Shops and Auction Theory*, 60 Stan. L. Rev. 1529, 1549 (2008) ("[A]uction theory does suggest that target boards of directors should push for conducting a true pre-signing auction rather than quickly signing a deal containing a go-shop granting the initial buyer information rights, a termination fee, expense reimbursement, and matching rights. This is especially true for companies that are selling themselves to financial buyers, since go-shops have structures that discourage bidding wars between financial buyers."); *see also* Steven Davidoff Solomon, *Flawed Bidding Process Leaves Dell at a Loss*, N.Y. Times (Apr. 23, 2013) at 2 (citing FactSet MergerMetrics showing that "[s]ince 2004, there have been 196 transactions with go-shops . . . . [i]n only 6.6 percent of these did another bidder compete during the go-shop period").

In his expert report for this case, Subramanian updated his empirical study from 2008. The original study identified six go-shops for MBOs, and found that none led to a superior offer. *Go-Shops vs. No-Shops*, *supra*, at 750. Since then, there have been two MBOs with go-shops. Both produced superior bids. *See* JX 909 ¶¶ 66-67. Subramanian distinguished both cases, noting that management was not key in either situation, and stood by his opinion that go-shops are generally ineffective in MBOs.

[36] *See Del Monte*, 25 A.3d at 840 n.5 (noting "the importance of the pre-signing phase to developing price competition among private equity bidders"). Renowned M&A practitioner Marty Lipton has contrasted the effects of adding another interested party at the front end of a deal negotiation with the effect of bargaining more vigorously with a single counterparty at the back end of the process. Lipton even roughly quantified the added value of adding a competing negotiator relative to greater negotiating skill in the initial two-party deal: "The ability to bring somebody into a situation is far more important than the extra dollar a share at the back end. At the front end, you're probably talking about 50%. At the back end, you're talking about 1 or 2 percent." Guhan Subramanian, *The Drivers of Market Efficiency in* Revlon *Transactions*, 28 J. Corp. L. 691, 691 (2003) (quoting Author's Interview with Martin Lipton, Senior Partner, Wachtell, Lipton, Rosen & Katz, in New York, NY (June 14, 2000)).

competition can help raise the prices offered during the pre-signing phase.[37] But the shadow of competition is more spectral and less efficacious than its reality: "Whether it should be so or not, human beings often value things—even other human beings like romantic partners—more when others might claim them."[38] Moreover, as discussed below, the similarities among financial bidders make them particularly susceptible to the winner's curse during a go-shop phase. *See infra* Part II.A.3.b.ii.b. There is also the "reality that there is not a culture of rampant topping among the larger private equity

---

[37] *Go-Shops vs. No-Shops*, *supra*, at 753 (arguing from sample transactions that because of the prospect of post-signing competition, pure go-shop transactions result in higher sales prices than single-bidder negotiations); *see* New *Unocal* Standard, *supra*, at 844 ("Knowing that a transaction will include a go-shop, wherein the seller will treat the initial bidder as a stalking horse to generate an active post-signing auction, may incent initial bidders to offer a preemptive bid to deter subsequent bids. In that view, the prospect of competition, even if no competition subsequently emerges, should be sufficient incentive for a bidder to shift transaction surplus to the seller."); Brian JM Quinn, *Bulletproof: Mandatory Rules for Deal Protection*, 32 J. Corp. L. 865, 879-80 (2007) [hereinafter *Bulletproof*] (surveying literature on auction theory and concluding that "[t]he two key insights are that competition, or the threat of competition, will lead to a price closer to the buyer's reservation price and that the price effect of one additional competitor is greater than the price effects attributable to bargaining").

[38] *Dollar Thrifty*, 14 A.3d at 615. *See* Nihat Aktas et al., *Negotiations Under the Threat of Auction*, 98 J. Fin. Econ. 241, 242 (2010) ("Our empirical results confirm the existence of latent competition on acquirers' bidding in one-on-one negotiations: More potential competitors are associated with higher bids."); John C. Easterwood et al., *Controlling the Conflict of Interest in Management Buyouts*, 76 Rev. Econ. & Stat. 512, 513 (1994) (recognizing that "[b]oth actual and potential competing offers could limit the ability of managers to underbid" in MBOs); *id.* at 515 (analyzing sample of transactions and finding that "implicit outside competition is not associated with higher abnormal returns compared to the returns experienced by stockholders of [MBOs] involving no competition whatsoever"); *id.* at 520 (concluding that "explicit competition from outside bidders is more effective than implicit competition").

players, who have relationships with each other that might inhibit such behavior."[39] The price established during the pre-signing phase is therefore critical, and it is the presence or realistic threat of competition during this period that drives up the price. [40]

---

[39] *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 121 (Del. Ch. 2007) (Strine, V.C.). Consistent with the professional culture of not topping other firms' deals, Silver Lake, KKR, Blackstone, and TPG were among the sponsors who settled a lawsuit alleging they and other private equity firms conspired to fix prices in LBOs. *See* Henry Sender, *KKR, Blackstone and TPG Pay $325m to Settle Collusion Lawsuit*, Fin. Times (Aug. 7, 2014), http://www.ft.com/intl/cms/s/0/0cee0c66-1e3e-11e4-bb68-00144feabdc0.html. Evidence from the suit included an email from the co-head of US buyouts at Carlyle, who allegedly wrote "KKR asked the industry to step down on HCA [Holdings Inc.]!" *Id.* KKR later withdrew and allegedly told Blackstone it was "standing down because [it] would not jump a signed deal of [Blackstone's]." *Id.* Blackstone allegedly responded that "[t]ogether, we can be unstoppable, but in opposition, we can cost each other a lot of money." *Id.*

Andrew Ross Sorkin of the New York Times made a similar point about Blackstone's involvement in the Company's go-shop, which Mandl described as "a pretty thoughtful commentary." JX 448 at 1. Sorkin wrote,

> The real question is why, despite the $25 million reimbursement guarantee, Blackstone is risking its reputation to even contemplate a deal for Dell.
>
> If Blackstone makes a formal bid . . . it will most likely be competing against a bid from Mr. Dell. While Blackstone has clearly been invited into the auction process, if Mr. Dell quits or is ousted as a result of a winning bid from Blackstone, the firm will appear to have made a hostile bid. Private equity firms have spent the last 25 years avoiding anything that could make them perceived as hostile because they typically want management teams to want to do business with them.

JX 446 at 3 (Andrew Ross Sorkin, *A $25 Million Question Over A Bid For Dell*, N.Y. Times (Apr. 1, 2013)).

[40] *See* Aktas et al., *supra*, at 242; Jeremy Bulow & Paul Klemperer, *Why Do Sellers (Usually) Prefer Auctions?*, 99 Am. Econ. Rev. 1544, 1568 (2009).

In this case, the record established that there was minimal competition during the pre-signing phase. The Committee initially engaged with only two financial sponsors, and KKR dropped out after providing its initial expression of interest. At that point, the Committee brought in TPG, but that firm dropped out as well. It is certainly true, as the Company argues, that the decisions that KKR and TPG made can be viewed as indicating that the Company was risky and difficult to value, but it also left the Committee negotiating with a single bidder. The Committee did not engage with Blackstone before signing, even though Blackstone approached the Company in January about a possible transaction.

During the pre-signing phase, the Committee did not contact any strategic buyers. HP was the obvious choice, and Evercore would later estimate that a deal between the Company and HP could generate between $3 and 4 billion in annual cost savings. Evercore doubted whether any other strategic bidders could acquire the Company given its size, and JPMorgan doubted that any strategic bidders would be interested. A direct, pre-signing outreach to HP therefore might well have been warranted. The Committee chose not to contact HP. The lack of any outreach to strategic bidders and the assessment that strategic interest was unlikely meant that the financial sponsors did not have to push their prices upward to pre-empt potential interest from that direction.

Without a meaningful source of competition, the Committee lacked the most powerful tool that a seller can use to extract a portion of the bidder's anticipated surplus. The Committee had the ability to say no, and it could demand a higher price, but it could not invoke the threat of an alternative deal. When the Committee made its final demand,

Silver Lake stood firm. It was Mr. Dell who bridged the gap by accepting a lower valuation for his rollover shares. Although he sacrificed some value by doing so, Evercore's analysis indicates that it was a good decision, and that he stands to enjoy greater returns than Silver Lake.

Taken as a whole, the foregoing evidence, along with other evidence in the record, establishes that there was a lack of meaningful price competition during the pre-signing phase. This factor undermined the reliability of the Original Merger Consideration as a measure of the Company's value, and because the offers received in the go-shop period keyed off the Original Merger Consideration, this factor also undermines the reliability of the Final Merger Consideration.

### b. The Post-Signing Phase

Although the evidence proved that the Original Merger Consideration was not the best evidence of fair value, the sale process did not stop there. The process entered a second phase, during which Evercore conducted a go-shop. Two higher bids emerged, one from Blackstone and another from Icahn. Blackstone eventually withdrew its bid, but Icahn continued to compete. When it appeared that stockholders would vote down the original deal, the Committee and the Buyout Group amended the Merger Agreement. The amendment provided for the Final Merger Consideration, representing an increase of 23 cents, or 2%, over the Original Merger Consideration.

Based on this evidence, the Company makes a straightforward argument: Capitalists want to make money, and America is full of capitalists, so it is counterintuitive and illogical—to the point of being incredible—to think that another

83

party would not have topped Mr. Dell and Silver Lake if the Company was actually worth more. In my view, this argument has force for large valuation gaps, and is sufficiently persuasive to negate the valuation of $28.61 per share that the petitioners advanced. If the Company was really worth more than double what the Buyout Group was paying, then a strategic bidder like HP would have recognized a compelling opportunity and intervened.

But the go-shop process was not sufficiently persuasive to rule out smaller valuation gaps. Financial sponsors—the only parties who showed interest in this case— faced the same leverage constraints and IRR hurdles as the Buyout Group, and the record demonstrated that a buyer using a leverage-based model would not bid high enough to generate fair value. The fact that two competing financial sponsors proposed higher-valued, debt-fueled alternatives indicates that the Original Merger Consideration was low, even when evaluated from the standpoint of the returns that a leverage-based model could generate. The topping bids also exceeded the Final Merger Consideration. They not only help confirm that the Original Merger Consideration did not provide fair value, but they also undercut the notion that the Final Merger Consideration provided fair value.

Although the go-shop phase in this case did increase the amount of consideration that the Company's stockholders received, that fact did not establish that the stockholders received fair value either. In this case, it demonstrated only that the stockholders received an amount closer to the highest price that a bidder whose valuation was derived from and dependent on an LBO model was willing to pay.

### i. The Results of the Go-Shop

The actual results of the go-shop process provide a starting place for analysis. To the good, it did generate two higher indications of interest for the whole Company. Blackstone, one of the world's largest and most sophisticated financial institutions, proposed to acquire the Company in a transaction that would give the Company's existing stockholders a choice between a cash payment of at least $14.25 per share or shares in a new entity valued at $14.25 per share, subject to a cap on the total amount of equity that the new entity would issue. Icahn, also a financially strong and highly sophisticated M&A player, proposed a similar transaction in which stockholders would receive a combination of cash and stock, subject to a cap on the amount of cash. Evercore valued Icahn's proposal at between $13.37 and $14.42 per share. Both transactions contemplated continuing the Company's operating business and generating returns predominantly through financial engineering. Blackstone may have contemplated selling the Company's financing arm to help pay down the acquisition debt.

As previously discussed, MBO go-shops rarely generate topping bids. Given that fact, for two higher bids to have emerged suggests that the Original Merger Consideration was relatively low. That conclusion is consistent with the evidence and the analysis of the pre-signing process conducted above. The fact that two higher bids emerged *from financial sponsors* suggests that the Original Merger Consideration was sufficiently low to enable other firms to be competitive *when using similar leveraged-pricing models.* Both Blackstone and Icahn were financial sponsors, and both were proposing leveraged transactions. Each planned to lever up a still-public company, return the resulting cash to

the public stockholders, and keep a public stub outstanding, but the underlying financial engineering paralleled what the Buyout Group was proposing. Both topping bidders were therefore constrained by the LBO model, both in terms of limits on the availability of leverage and the pricing necessary to generate the required IRRs over the anticipated investment period. The fact that they emerged indicates that the Original Merger Consideration was low not only when judged against a fair value metric, but also when judged by an LBO model.

In this case, therefore, one evidentiary implication of the results of the go-shop is to reinforce the conclusion that the Original Merger Consideration did not equate to fair value. It has similar evidentiary implications for the Final Merger Consideration. Although Blackstone later withdrew its bid, Icahn continued to advance its proposal. When it appeared that stockholders would vote down the Merger if all the Buyout Group offered was the Original Merger Consideration, the Buyout Group increased its price. The question then becomes whether the increase was sufficient to establish the Final Merger Consideration as fair value. This decision finds that the answer is "no."

As during the pre-signing process, competition from a financial sponsor might have induced the Buyout Group to increase its bid within the confines of the LBO model, but it did not lead to competition at a level indicative of fair value. When it appeared that stockholders would vote down the deal, the Buyout Group increased its offer by 23 cents, or approximately 2% of the Original Merger Consideration. The 2% bump is consistent with an increase within the confines of the LBO model. Notably, both Blackstone's proposal and the upper range of Icahn's proposal exceeded the Final Merger

Consideration as well. The fact that the holders of just over half of the unaffiliated shares outstanding took the price does not mean it is equivalent to fair value. "[C]ertain institutional investors may be happy to take a sizeable merger-generated gain on a stock for quarterly reporting purposes, or to offset other losses, even if that gain is not representative of what the company should have yielded in a genuinely competitive process." *Glob. GT LP v. Golden Telecom, Inc. (Golden Telecom I)*, 993 A.2d 497, 508-09 (Del. Ch. 2010) (Strine, V.C.), *aff'd*, 11 A.3d 214 (Del. 2010).

The 2% increase that the Buyout Group offered to secure a favorable vote was all that the go-shop process achieved. Given the evidence that the pre-signing phase did not generate a price that was equivalent to fair value, and in light of the nature of the competition that took place during the go-shop phase, the 2% bump was not sufficient to prove that the Final Merger Consideration was the best evidence of fair value.

### ii. Other Reasons Why The Go-Shop Did Not Induce Greater Competition

As previously discussed, MBO go-shops rarely generate topping bids. At trial, Subramanian gave persuasive testimony about various factors that generally limit the efficacy of MBO go-shops, and he explained why those factors were present to a significant degree in this case. Notably, the framework for analyzing the go-shop is *not* the standard that would apply in a fiduciary duty case, *viz.* whether the go-shop was preclusive or whether the decision to include the structure fell within the range of reasonableness. In other words, the operative question is not answered by showing that a particularly strong and determined bidder could overcome the structural and functional

87

disincentives and make a topping bid, meaning that that the go-shop was not preclusive, nor by explaining why a transaction that included a go-shop was a proportionate means of pursuing the best transaction reasonably available for the stockholders, regardless of whether or not it actually succeeded, meaning that the go-shop fell within the range of reasonableness. The question for appraisal is whether the Company showed that the structure in fact generated a price that persuasively established the Company's fair value.

Subramanian discussed why MBO go-shops, although generally legitimate from the standpoint of fiduciary duty analysis, can function inadequately for purposes of price discovery. His analysis demonstrates why a bidder—and particularly a financial sponsor—would choose not to intervene in a go-shop, even if it meant theoretically leaving money on the table by allowing the initial bidder to secure an asset at a beneficial price.

At the heart of Subramanian's analysis is the recognition that before making a bid, a potential overbidder will evaluate whether it has a realistic pathway to success.

> [I]n this chess game of M&A, most of these parties being very sophisticated, don't just think incrementally one step ahead. They're thinking two, three, four, five moves ahead. Any third party looking at this would say, "What is my pathway to success?" So even if you value this thing at a very high number, you might reasonably say there's no pathway to success and, therefore, I'm not going to start on this process because there's no finish line.

Tr. 811 (Subramanian). The pathway to success must be sufficiently realistic to warrant incurring the time and expense to become involved in a contested situation, as well as the potential damage to professional relationships and reputation from intervening and possibly being unsuccessful.

### a) Structural Issues

The structure of the go-shop is an obvious factor that affects a participant's pathway to success. In a presentation in January 2013, Evercore gave the Committee the following advice about various structural aspects:

- "A longer go-shop period increases the amount of time that potential third parties have to evaluate a possible transaction."

    – "The complexity of a transaction and the current industry and market conditions can potentially impact the duration of a go-shop."

- "A lower termination fee in effect during the go-shop period reduces the value leakage to shareholders."

    – "A superior proposal needs to overcome the implied termination fee per share in addition to providing incremental value to shareholders."

    – "If a transaction is not consummated, shareholders bear the cost of the termination fee."

- "Broader definitions of what constitutes a superior proposal gives more latitude to the Special Committee."

- "Matching rights, unless limited, serve to discourage bidders and should be avoided."

JX 301 at 18. Subramanian generally focused on the same structural features.

With the benefit of advice from Evercore, the Committee negotiated a go-shop that raised fewer structural barriers than the norm. One critical issue is the length of the go-shop period, which defines the amount of time that a bidder has to understand the target company and decide whether to proceed. The issue is more complex than simply counting the number of days that the go-shop provides. An equally important factor is what a bidder must do before the end of the go-shop period to be defined as an "Excluded Party," which is the status that allows the bidder to continue negotiating with the target

after the go-shop time period runs out and still receive the benefit of a lower termination fee. More flexible go-shops only require an acquirer to provide a non-binding indication of interest in a transaction that could lead to a Superior Proposal, and they define the concept of "Superior Proposal" broadly. More restrictive go-shops demand more, such as a *bona fide* offer that qualifies as a Superior Proposal, a fully financed bid, or even a fully negotiated merger agreement. A nominally shorter go-shop that requires less to qualify as an Excluded Party may be more open as a practical matter than a nominally longer go-shop that imposes tougher criteria for Excluded Party status. The sufficiency of the amount of time also varies with the size and complexity of the target. A deal involving a bigger and more complex target requires more diligence, is more difficult to finance, and may require the bidder to assemble a consortium, which takes additional time.

In this case, the structure of the go-shop was relatively open. The length of the go-shop period was forty-five days, which Subramanian testified was "about average" for the sample deals he studied. Tr. 786 (Subramanian). The steps required to become an "Excluded Party" were also relatively few: A bidder only needed to submit a letter with a general outline of the structure of a transaction sufficient for the Committee to conclude that it "is or could reasonably be expected to result in a Superior Proposal." JX 349 § 5.3(i). A party who satisfied that standard would achieve Excluded Party status and could continue to negotiate with the Committee, theoretically until stockholders approved the deal. In this case, an Excluded Party at the end of the forty-five day go-shop period would have had another four months before the special meeting, originally scheduled for July 18.

Other structural features of the go-shop were also relatively flexible. The termination fee during the go-shop period for an Excluded Party was $180 million, representing approximately 1% of equity value of the original deal and 40% of the $450 termination fee that otherwise would apply. An Evercore banker testified that usually the lowered termination fee is half of the base termination fee, so the Merger Agreement was a little better on that score. More importantly, the Merger Agreement only contemplated a single opportunity for the Buyout Group to match a higher bid, after which the match right in the Merger Agreement expired. The one-time match is more favorable to a topping bidder than an unlimited match right, which is a powerful disincentive.[41] At the

---

[41] A matching right is the functional equivalent of a right of first refusal, and scholars have analyzed them as such. *See Bulletproof*, *supra*, at 870 ("The presence of rights of first refusal can be a strong deterrent against subsequent bids and is therefore a potentially potent protective measure in the non-*Revlon* context. . . . Success under these circumstances may involve paying too much and suffering the 'winner's curse.'"); *see also* Frank Aquila & Melissa Sawyer, *Diary Of A Wary Market: 2010 In Review And What To Expect In 2011*, 14 M & A Law. Nov.-Dec. 2010, at 1 ("Match rights can result in the first bidder 'nickel bidding' to match an interloper's offer, with repetitive rounds of incremental increases in the offer price. Targets and buyers are starting to question whether this dynamic produces the best results. One alternative would be for the initial bidder to make a sizeable topping bid instead of a matching bid, but demand a higher break fee as the *quid pro quo*. if [sic] the bidder, as part of that package, announces that it is making its 'best and final bid,' then the target may conclude there is no justification for granting continuing match rights as part of the package. In addition, targets are starting to question whether it makes sense for initial bidders to have match rights when the merger agreement contains an explicit go-shop. Few go-shops are successful as it is . . . and match rights are just one more factor that may dissuade a potential competing bidder from stepping in the middle of an already-announced transaction."); Marcel Kahan & Rangarajan K. Sundaram, *First-Purchase Rights: Rights of First Refusal and Rights of First Offer,* 14 Am. L. & Econ. Rev. 331, 331 (2012) (finding "that a right of first refusal transfers value from other buyers to the right-holder, but may also force the seller to make suboptimal offers"); David I. Walker, *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 20-21 (1999) (discussing how a right of first refusal affects bidders);

same time, it presents more of a hurdle than simple information rights. *See Go-Shops vs. No-Shops*, *supra*, at 760.

The main structural problem that Subramanian identified did not result from the terms of the go-shop in the abstract, but rather stemmed from the size and complexity of the Company. The Merger was *twenty-five times larger* than any transaction in Subramanian's sample of "jumped" deals, meaning that a successful topping bid literally would have been unprecedented. The extent of Blackstone's efforts gives a sense of what was required. To get to Excluded Party status, Blackstone had to spend in excess of $25 million and assemble a due diligence team that filled a ballroom, and Blackstone is one of the world's most sophisticated private equity firms. Blackstone also retained Dell's

---

*cf.* Steven J. Brams & Joshua R. Mitts, *Mechanism Design in M&A Auctions*, 38 Del. J. Corp. L. 873, 879 (2014) ("The potential for a bidding war remains unless interlopers are restricted-say, to one topping bid, which then can be matched."). Unlimited matching rights have a particularly strong deterrent effect on financial sponsors. Brian JM Quinn, *Re-Evaluating the Emerging Standard of Review for Matching Rights in Control Transactions*, 36 Del. J. Corp. L. 1011, 1027-28 (2011) ("[T]he presence of a matching right in the hands of an initial common value bidder will deter other common value bidders from making bids. Financial buyers have a well-known aversion for engaging in bidding contests. Consequently, it appears that the threat of the winner's curse is at least implicitly understood by market participants. Finally, the direct effect of the matching rights in the context of a common value auction is to appropriate transaction gains from the seller to the right-holder. Because other market participants are hesitant to offer topping bids in the common value context, this permits the right-holder to offer low-ball bids and thereby extract transaction surplus at the expense of selling shareholders. . . . The common value bidder is able to create private value by offering a bid lower than its full valuation of the seller." (footnotes omitted)). Evercore advised the Committee that "[m]atching rights, unless limited, serve to discourage bidders and should be avoided." JX 266 at 35.

former head of M&A and strategy, Dave Johnson, to lead its acquisition team and had the benefit of his insights.

At bottom, the evidence in this case shows that it was possible to achieve Excluded Party status. Blackstone, Icahn, and GE Capital all provided initial expressions of interest within the forty-five day go-shop period. But that does not mean that the magnitude of the task did not have a chilling effect on other parties. The size and complexity of the Company remains a factor for purposes of analyzing the go-shop.

### b) The Winner's Curse

A far more significant problem with MBO go-shops is that incumbent management has the best insight into the Company's value, or at least is perceived to have an informational advantage. Competing bidders therefore face threat of the winner's curse:

> As a third party, the implication is if you bid and you win, you've just learned that you think this company is worth more than management. Now, maybe you're really smart. Maybe you have some source of synergy or something else that makes you smarter than management; but absent that kind of edge, . . . you'd have to say to yourself "I've almost certainly overpaid because the inside bidder, they looked at my offer and they decided not to match it. So either I'm very smart, smarter than the inside people," which [is] unlikely to be the case, "or I've just overpaid."

Tr. 782-83 (Subramanian).

Bidders can compensate for information asymmetries by conducting due diligence, by using their own independent industry knowledge, or by hiring expert advisors. Strategic buyers are less subject to the winner's curse because they typically possess industry-specific expertise and have asset-specific valuations that incorporate synergies.

93

Financial sponsors are "much more concerned about a winner's curse" because they price deals using similar financial models and seek to generate value from portfolio companies using similar techniques. Tr. 783 (Subramanian). "Just as Person B would not want to bid against Person A for the contents of Person A's wallet, no financial buyer would want to bid against a financial buyer working with management." Denton, *supra*, at 1546.

In this case, the threat of the winner's curse rendered questionable the existence of a pathway to success. As the Company's founder and longtime CEO, Mr. Dell knew more about the Company than anyone else. Before any bidder would become involved, they had to have a strategy for dealing with Mr. Dell's superior knowledge.

For those bidders who became involved during the go-shop period, the Committee sought to address the information asymmetry issue by providing extensive due diligence. Although Blackstone had to push for certain information that Silver Lake was given voluntarily, all of the bidders received access to the data they requested. The Committee and Evercore also ensured that Mr. Dell was available. Mr. Dell personally provided all of the bidders with management presentations, and he ultimately spent more time with Blackstone than any of the other participants, including Silver Lake. The record provided no reason to harbor any concern about Mr. Dell's level of cooperation or responsiveness.

In the end, for the bidders who actually engaged during the go-shop period, the Committee appears to have addressed the problem of information asymmetry and the risk of the winner's curse as best they could. The problems are endemic to MBO go-shops and create a powerful disincentive for any competing bidder—and particularly competing

94

financial bidders—to get involved. It can happen, as Blackstone and Icahn demonstrated, but practical hurdles make it less likely.

### c) Mr. Dell's Value To The Company And Role In The Buyout Group

A third impediment to competitive bidding was Mr. Dell's value to the Company. Subramanian showed that the Company's relationship with Mr. Dell was an asset in itself. To illustrate Mr. Dell's value, Subramanian conducted two event studies. He determined the stock price effect of Mr. Dell's departure from the Company in March 2004, and he measured the stock price effect of his return in 2007. Subramanian calculated that in March 2004, the Company lost $1.2 billion in market value. In January 2007, the Company gained $2.5 billion in market value. Subramanian concluded from these studies that Mr. Dell's association with the Company contributed significant value.[42]

---

[42] Mr. Dell's relationships with customers may have been one of the sources of his value. During the go-shop process, a news report suggested that Blackstone was vetting candidates to replace Mr. Dell. After reading the account, Mr. Dell sent an email to Blackstone, which stated:

> This evening I was having dinner with a potential customer worth over $600 million in revenue to our company. They were reacting quite negatively to the story and others like it. The customer was suggesting ways to contractually protect themselves from the risk associated with . . . the kinds of changes suggested in press speculation. I am disappointed by the real damage[] stories like this and others are inflicting on our business.

JX 449 at 1. The email suggests that customers valued Mr. Dell's involvement and would take their business elsewhere if he left.

To perceive a path to success, a competing bidder had to account for Mr. Dell's value. Mr. Dell was part of the Buyout Group, so the incumbent party to the Merger Agreement had the benefit of that asset. A competing bidder that did not have Mr. Dell as part of its buyout group would be bidding for a company without that asset and would end up with a less valuable company.

There was also the problem of Mr. Dell's financial incentives. He was a net purchaser in the transaction, meaning he was buying more equity in the post-MBO Company than he was selling. Mr. Dell rolled over his entire 16% equity stake into the new company and contributed $750 million in cash. Through the transaction, he increased his ownership in Dell to 74.9%.

Because Mr. Dell was a net purchaser, any increase in the deal price would cost him money. If Mr. Dell kept the size of his investment constant as the deal value increased, then Silver Lake would have to pay more and would demand a greater ownership stake in the post-transaction entity. Subramanian showed that if Mr. Dell wanted to maintain 75% ownership of the post-transaction entity, then he would have to contribute an additional $250 million for each $1 increase in the deal price.[43] If Mr. Dell did not contribute any additional equity and relied on Silver Lake to fund the increase, then he would lose control of the post-transaction entity at a deal price above $15.73 per

---

[43] This calculation assumes that the amount of debt financing increased proportionately. If the debt level remained constant and all of the price increase had to be funded with equity, then each $1 increase in the deal price would cost Mr. Dell more than $1 billion. Tr. 794-96 (Subramanian).

share. Because Mr. Dell was a net buyer, any party considering an overbid would understand that a higher price would not be well received by the most important person at the Company.

The Committee commendably tried to address Mr. Dell's role and the advantage that his participation conferred on the Buyout Group. In the confidentiality agreement that Mr. Dell signed, he agreed "to explore in good faith the possibility of working with any such potential counterparty or financing source if requested by the Committee; it being understood that your decision as to whether to work with any counterparty or financing source after such good faith exploration shall be within your discretion." JX 125 at 2. The Company oversold this provision during the trial as a binding requirement that Mr. Dell work with any bidder, which it was not, but the contract term was nevertheless helpful. It could have been more specific,[44] but it was better than no commitment at all.

More importantly, the record indicated that Mr. Dell actually was willing to work with other buyout groups. Mr. Dell testified credibly on that point, and his contemporaneous actions during the sale process were consistent with his testimony. In a

---

[44] *Cf.* J.Crew Group Inc., Definitive Proxy Statement (Schedule 14A) 91 (Jan. 25, 2011) (noting cooperation agreement with CEO/Chairman that included promise to: "[1] participat[e] in meetings, presentations, due diligence sessions and other sessions with persons interested in making a takeover proposal; [2] assist[] in the preparation of solicitation materials, offering documents and similar documents to be used in connection with such efforts; and [3] cooperat[e] and assist[] in obtaining any consents, waivers, approvals and authorizations for and in connection with any takeover proposal").

different case in which a key employee was less forthcoming, a comparable commitment might not be as persuasive.

There is also evidence that Blackstone and Icahn did not regard Mr. Dell as essential to their bids. Blackstone explored alternative CEO candidates. Icahn described Mr. Dell as a negative factor in an open letter to stockholders:

> Perhaps the most important reason [the Silver Lake bid undervalues the Company] is Dell has a major liability that can be easily removed and that I believe would make the company a great deal of value. It is the CEO, Michael Dell. If Dell can replace Michael Dell, I think that the company would be worth far, far more. I do not say this facetiously. I fully expect to be able to identify a first class person to run Dell if our slate of directors are elected at the annual meeting.

Dell, Inc., Carl C. Icahn Issues Open Letter to Stockholders of Dell (Schedule 14A) (July 29, 2013). Icahn thought that "[a]ll would be swell at Dell if Michael and the board bid farewell." JX 730 at 1.

As with the other go-shop considerations, Mr. Dell's value to the Company and his association with the Buyout Group were impediments, but not insuperable ones. Exceptional bidders like Blackstone and Icahn could overcome them, but Mr. Dell's unique value and his affiliation with the Buyout Group were negative factors that inhibited the effectiveness of the go-shop process.

### c. The Probative Value Of The Sale Process

Taken as a whole, the Company did not establish that the outcome of the sale process offers the most reliable evidence of the Company's value as a going concern. The market data is sufficient to exclude the possibility, advocated by the petitioners' expert, that the Merger undervalued the Company by $23 billion. Had a value disparity of that

magnitude existed, then HP or another technology firm would have emerged to acquire the Company on the cheap. What the market data does not exclude is an underpricing of a smaller magnitude, given that all of the participants constructed their bids based on a leveraged financing model and were limited by its constraints.

## B. The DCF Analysis As Evidence Of Fair Value

The DCF analysis is a well-established method of determining the going concern value of a corporation. "[T]he DCF . . . methodology has featured prominently in this Court because it is the approach that merits the greatest confidence within the financial community." *Owen v. Cannon*, 2015 WL 3819204, at *16 (Del. Ch. June 17, 2015) (quotation marks omitted).

> Put in very simple terms, the basic DCF method involves several discrete steps. First, one estimates the values of future cash flows for a discrete period . . . . Then, the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably using a perpetual growth model. Finally, the value of the cash flows for the discrete period and the terminal value must be discounted back . . . .

*Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005) (Strine, V.C.) (footnote omitted).

The petitioners' expert, Professor Bradford Cornell, used a DCF analysis to opine that the Company had a fair value of $28.61 per share on the closing date. The respondent's expert, Professor Glenn Hubbard, used a DCF analysis to opine that the Company had a fair value of $12.68 per share on the closing date. Two highly distinguished scholars of valuation science, applying similar valuation principles, thus generated opinions that differed by 126%, or approximately $28 billion. This is a

recurring problem. *See* Modern Appraisal Litigation, *supra*, at 19-20 (reviewing appraisal decisions and finding that "for respondents' experts, the median valuation was 16% below the merger price, and the mean was 22% below. For petitioners' experts, the median valuation was 78% above the merger price, and the mean was 186% above."). This decision does not exhaustively describe the DCF methodology; it only addresses the areas of substantial disagreement between the experts.

### 1. Forecasts

The difference in the experts' DCF valuations was driven primarily by the projected cash flows they used. Cornell weighted equally the BCG 25% Case and the BCG 75% Case, effectively creating a BCG 50% Case. Cornell then gave equal weight to the BCG 50% Case and the Bank Case, with an additional $1 billion in cost savings added to the Bank Case. Hubbard used an adjusted version of the BCG 25% Case. Both experts regarded the July and September Cases as overly optimistic and, in any event, stale by the time of the Merger.

Both experts treated the BCG 25% Case as reliable. BCG was an unbiased third-party expert. The Committee hired BCG to prepare a detailed set of forecasts that valued the Company as a going concern. BCG built its forecasts from the bottom up with input from management and took into account the Company's historical performance and Street projections. The forecasts comported with the evidence presented at trial, in that they projected declining margins for the end-user computing business and increasing margins for the enterprise service and solutions business. The projections were impressively thorough, with over 1,100 specific assumptions. The resulting model was

100

dynamic and transparent. The Committee, BCG, and J.P. Morgan regarded the BCG 25% Case as a realistic and achievable set of projections for the Company.

For purposes of a valuation as of the Merger date, the BCG 25% Case has some weaknesses. The projections were prepared in January 2013 and never updated. The Company's actual operating income for FY 2014 was more than 36% below the BCG 25% Case. In addition, BCG's projections for revenue from PC sales in FY 2015 and FY 2016 appeared high once IDC reported lower rates of PC shipments in August 2013.

Hubbard adjusted the BCG 25% Case to account for these weaknesses. First, he updated the revenue projections to incorporate the results of the August 2013 IDC report, which implied a 10% decline in shipments for desktop PCs and a 23% decline for notebook sales by FY 2017. These adjustments were reasonable and an appropriate means of addressing the concern that the BCG 25% Case had become stale by the time of the closing date. To make these adjustments, Hubbard used current IDC data and maintained the dynamic model's mechanics, formula, and internal assumptions. Consistent with the Company's experience through closing, Hubbard maintained the Company's profit margins.

Second, because of the adjustment to projected sales for the Company's primary products in the end-user computing business, Hubbard updated the revenues that would flow from sales of secondary products (*i.e.*, the attachment rates). He relied on figures from the September Case to make the adjustment.

Third, Hubbard adjusted for stock-based compensation. The experts agreed on the pre-tax figure for the adjustment. *See also Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013

WL 3793896, at \*12 (Del. Ch. July 8, 2013) (collecting cases supporting treating stock-based compensation as a non-cash expense).

Fourth, Hubbard created a five-year transition period in the projections from FY 2018 through FY 2022. The resulting three-stage model better captured the operative reality of the Company and the likely schedule for the transformation plan to generate results. *See Andaloro*, 2005 WL 2045640, at \*12-13 (adding a stage to create a three-tiered DCF so as to make the calculation of cash flows "a bit more explicit" and noting that "[a]s a general matter, neither a [two stage nor a three stage DCF] is inherently preferable").

This court has expressed a preference for valuations "based on contemporaneously prepared management projections." *Doft & Co. v. Travelocity*.com, 2004 WL 1152338, at \*5 (Del. Ch. May 20, 2004). Generally speaking, our appraisal jurisprudence is skeptical of litigation-driven adjustments to management projections.[45] In this case, however, Hubbard persuasively justified his changes, and this court has used adjusted projections

---

[45] *E.g.*, *Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at \*2 (Del. Ch. Feb. 10, 2004) ("[T]his Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely."); *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at \*7 (Del. Ch. Dec. 31, 2003) ("Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, post hoc, litigation-driven forecasts have an 'untenably high' probability of containing 'hindsight bias and other cognitive distortions.'" (quoting *Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001))), *aff'd in pertinent part, rev'd in part*, 875 A.2d 602 (Del. 2005).

when the expert has provided sufficient support for the modifications.[46] The BCG 25%

Case with Hubbard's adjustments is a reliable set of forecasts for the Company. Given

the Company's litigation incentives, however, it likely represents (on the margin) a

relatively conservative forecast.

Cornell also used the BCG 75% Case. The cost-savings in the BCG 75% Case

bore few indicia of reliability. One was vaguely labeled "client reinvention initiative,"

which no one at trial explained. Due to the aggressive initiatives it contemplated, the

BCG 75% Case "impl[ied] margins in fiscal year 2016 that are higher than those ever

achieved by the Company or its principal competitors." JX 532 at 63-64.

Cornell also used the Bank Case. That set of projections was completed in

September 2013, closer in time to the closing date than any of the other projections. It is a

federal felony "to knowingly obtain any funds from a financial institution by false or

fraudulent pretenses or representations," which enhances the credibility of a set of

projections that is provided to a financial institution. *Del. Open MRI Radiology Assocs.,

P.A. v. Kessler*, 898 A.2d 290, 317 n.57 (Del. Ch. 2006) (Strine, V.C.) (citing 18

U.S.C.A. § 1344 (2006)). Silver Lake prepared the projections, but Company

management provided key inputs, and Mr. Dell implicitly approved the projections by

---

[46] *See Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 62 (Del. Ch. 2007) (adopting reasonable updates to management projections); *Andaloro*, 2005 WL 2045640, at *11 (adjusting management forecasts to exclude revenue from division deemed likely to be sold); *In re U.S. Cellular Operating Co.*, 2005 WL 43994, at *11-15, *19 (Del. Ch. Jan. 6, 2005) (building projections based on expert-created forecasts and finding DCF most reliable evidence of value).

103

endorsing them at a rating agency presentation. Hubbard regarded the projections as reasonable.

At the same time, the Bank Case was relatively optimistic. Silver Lake's forecasts projected increasing margins for the PC business, despite the Company's near-term strategy of sacrificing margin to retain market share and market evidence showing a shift to low-margin value PCs. Silver Lake also based its projections on the private company status of the post-transaction entity. That is not a significant concern in this case, because the Buyout Group planned to continue managing the Company's business after closing using the same business plan, and the quantum of administrative savings resulting from no longer being a public company was not material to a corporation of the Company's magnitude.

Hubbard adjusted the Bank Case to account for non-recurring restructuring expenses and for stock-based compensation. This decision adopts these changes, as well as his adjustment factor.

This decision concludes that there are two sets of reliable forecasts for the Company: Hubbard's adjusted BCG 25% Case, which was likely somewhat conservative, and Hubbard's adjusted Bank Case, which was likely somewhat optimistic.

### 2. The Perpetuity Growth Rate For The Terminal Period

Cornell used a perpetuity growth rate of 1%. Hubbard used 2%. This court has held that "the rate of inflation is the floor for a terminal value estimate for a solidly profitable company that does not have an identifiable risk of insolvency." *Glob. GT LP v. Golden Telecom, Inc. (Golden Telecom I)*, 993 A.2d 497, 511 (Del. Ch. 2010) (Strine,

104

V.C.), *aff'd*, 11 A.3d 214 (Del. 2010). Cornell's 1% perpetuity growth rate is lower than inflation. Even Hubbard's 2% growth rate is arguably too low. Given the Company's status as a mature Company whose growth rate should fall somewhere above inflation and close to GDP, a 3% rate could be more appropriate. *See id.* ("Generally, once an industry has matured, a company will grow at a steady rate that is roughly equal to the rate of nominal GDP growth."). This decision nevertheless uses the 2% rate.

### 3.    Taxes

The experts disagree about the appropriate tax rate to apply to the Company's cash flows. Cornell used a 21% tax rate throughout his forecast period, which he drew from the September Case and the valuation models prepared by the Company's financial advisors. Hubbard used two different tax rates. He used a 17.8% tax rate during the projection and transition periods, which he drew from the report of a tax expert, Stephen Shay. He used the 35.8% marginal tax rate for the terminal period, which he justified with citations to academic literature. *See, e.g.*, JX 896A ¶ 222.

The Company has not paid taxes at the marginal rate since at least 2000. In the five years leading up to the Merger, the Company paid taxes at effective rates that varied between 16.5% and 29.2%. For the same period, the Company's cash tax rates (*i.e.*, the amount of taxes actually paid in cash) ranged from 9.6% to 24.1%.

The Company's low effective tax rate is due, in part, to its ability to defer payment of domestic taxes on income earned overseas. The Company has made an "indefinite reinvestment election," meaning that it has represented to its auditors that it intends to indefinitely reinvest its earnings overseas. Tr. 934 (Shay). The election allows the

Company to defer paying U.S. taxes on approximately $19 billion in overseas profits. For its auditors to approve this election, they needed "evidence of specific plans for reinvestment of undistributed earnings." Fin. Accounting Standards Bd., *APB 23: Accounting for Income Taxes—Special Areas* 4 (1972). At the time of the Merger, there was ample evidence to support the election.[47]

The Company will never pay domestic taxes on profits attributable to offshore income unless and until it actually repatriates them. The only time the Company repatriated significant overseas income was in 2004 and 2013, during U.S. tax holidays that made the repatriations effectively tax free. In 2004, the Company repatriated $4 billion. In 2013, it repatriated $9 billion. The Company also had used earnings from foreign subsidiaries to facilitate intercompany transfers.

The Company has not deviated from its representation that it will continue to reinvest its overseas earnings indefinitely in foreign projects. The Company instructed Houlihan Lokey, Inc. to use a 17% tax rate when conducting a post-closing valuation. Management told bidders during due diligence to expect the difference between the Company's effective tax rate and its cash rate to continue for the foreseeable future.

---

[47] Tr. 331-332 (Sweet) (testifying that at the time of the Merger, the Company had opportunities for overseas growth and planned to increase its presence in the BRIC countries, the Asia Pacific region, and other emerging markets); JX 161 at 20 (management presentation noting plans to "[c]apitalize on the shift of geographic wealth to emerging countries"); JX 534 at 2 (proxy statement noting that "following the merger, the Company will make significant investments to enhance its presence and ability to compete in emerging markets, including the BRIC countries . . . [and will] expand aggressively in other parts of Asia, Latin and South America, Central and Eastern Europe, the Middle East and Africa").

Hubbard's model implies that, beginning in 2023, Dell will begin paying taxes on all of its global profits at the U.S. marginal tax rate of 35.8% and will continue doing so perpetually. The factual record establishes the opposite. In fact, it would be highly speculative for this court to choose a date when, contrary to its historical practice, the Company would begin to repatriate foreign earnings.[48] Cornell's tax estimate is more reliable and consistent with the Company's operative reality.[49]

### 4. The Weighted Average Cost of Capital

To discount the cash flow projections to their present value, the experts computed the Company's weighted average cost of capital ("WACC"). The parties dispute every

---

[48] *See Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 552 (Del. 2000) ("[T]the Court of Chancery should have excluded any deduction for the speculative future tax liabilities"); *Ng v. Heng Sang Realty Corp.*, 2004 WL 885590, at *6 (Del. Ch. Apr. 22, 2004) ("In determining fair value, this Court cannot consider speculative tax liabilities."), *aff'd*, 867 A.2d 901 (Del. 2005) (TABLE).

[49] *In re AT&T Mobility Wireless Operations Hldgs. Appraisal Litig.*, 2013 WL 3865099, at *4 (Del. Ch. Jun. 24, 2013) (adopting effective tax rate that was "[c]onsistent with the Companies' operative reality"). For decisions using the effective tax rate rather than the marginal tax rate, see *Owen v. Cannon*, 2015 WL 3819204, at *24 (Del. Ch. June 17, 2015) (adopting 22.71% tax rate); *Golden Telecom I*, 993 A.2d at 513 (adopting 31.6% tax rate based on predictions of management and company's historical tax rate), *aff'd*, 11 A.3d 214 (Del. 2010); *Del. Open MRI.*, 898 A.2d at 330 (adopting 29.4% tax rate); *Ng*, 2004 WL 885590, at *6 (adopting 11% tax rate), *aff'd*, 867 A.2d 901 (Del. 2005) (TABLE) ("[I]t appears to the Court that the Court of Chancery's factual determination as to the appropriate tax rate to apply to projected future earnings in a discounted cash flow valuation was supported by the record."). *But see In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *20 (Del. Ch. Jan. 30, 2015) (holding that it was "overly speculative to apply the current tax rate in perpetuity . . . '[b]ecause of the transitory nature of tax deductions and credits'" (quoting *Henke v. Trilithic Inc.*, 2005 WL 2899677, at *9 (Del. Ch. Oct. 28, 2005))).

input except for the risk-free rate of 3.31%. The inputs selected below generate a WACC of 9.46%.

### a. The Cost Of Debt

The experts disagreed about the cost of debt. Before the Merger, the Company had an "A" credit rating. In May 2013, Standard & Poor's downgraded the Company's credit rating to "BBB" after poor first-quarter results. The "rating downgrade reflect[ed] significant deterioration in the operating performance of Dell's end user computing segment," not the impending buyout. JX 523 at 2. As of October 29, 2013, long-term BBB rated bonds had a 4.95% yield to maturity. JX 897A ¶ 104. This decision adopts that rate as the cost of debt.

### b. Capital Structure

The experts disagreed about the Company's capital structure. Cornell used the Company's pre-announcement ratio of debt to total capitalization to conclude that 75.25% of the capital structure was equity. Hubbard used the Company's average ratio of equity to total capital calculated on a quarterly basis between January 12, 2011, and January 11, 2013, to conclude that 74.75% of Dell's capital structure was equity. Both approaches are reasonable. This decision uses 75%.

### c. Beta

The experts disagreed about beta. Cornell derived a beta of 1.35 by analyzing the Company's peers. Hubbard derived a beta of 1.31 by analyzing weekly observations over a two-year period. A beta specific to the Company is more targeted than a blended beta calculated from peer companies, particularly when both experts opined that the Company

had few peers. *See Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *18 (Del. Ch. July 8, 2013). This decision uses Hubbard's beta.

### d. The Equity Risk Premium

The experts disagreed about the appropriate equity risk premium. Cornell used a forward-looking equity risk premium of 5.50%. Hubbard used a blended historical and supply-side equity risk premium of 6.41%. This decision uses the supply-side equity risk premium of 6.11%. *See Golden Telecom I*, 993 A.2d at 516; *see also Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *12 (Del. Ch. Oct. 21, 2015) (collecting cases).

### 5. Adjustments To Cash

The experts agreed that excess cash should be added to the valuation, but they disagreed about how much cash was excess. At the time of the Merger, the Company had $11.040 billion in cash and $5.054 billion in debt on its balance sheet. After adding back $172 million in transaction-related expenses, the Company had net cash of $6.158 billion. Cornell added the full amount of net cash to Dell's enterprise value. Hubbard made four deductions: (i) $3 billion for working capital, (ii) $2 billion for restricted cash, (iii) $2.24 billion for deferred taxes, and (iv) $3 billion for contingent taxes.

### a. Working Capital And Restricted Cash

Working capital and restricted cash can be addressed together. The witness testimony and contemporaneous documentary evidence supported Hubbard's opinion that the Company required at least $3 billion in working capital. Silver Lake left $5.665

billion in cash on the balance sheet after closing. The $3 billion working capital figure is reasonable.

Contemporaneous evidence also shows that the Company had $2 billion in restricted cash. A single adjustment is necessary, however, to account for a rating agency presentation in April 2014, where the Company stated that it had obtained access to $0.8 billion in restricted cash before the Merger closed.

This decision deducts working capital of $3 billion and restricted cash of $1.2 billion from the Company's available cash for purposes of determining its enterprise value.

### b. Deferred Taxes

The experts disagreed about deferred taxes. Hubbard deducted $2.24 billion for deferred taxes attributable to the Company's foreign earnings and profits. This decision has already resolved this issue by accepting the Company's representation that it will reinvest its overseas earnings indefinitely in overseas projects, meaning it will not have to pay any U.S. taxes on that income. If anything, this approach is conservative. The Company's CFO testified that the effective tax rate includes deferred taxes, and that the Company's cash tax rate is lower than the effective rate because the effective tax rate includes substantial deferred tax liabilities. In other words, the effective tax rate accounts for the deferred taxes, and because the Company never plans to repatriate those funds, a proper valuation would have to back out any deferred taxes on foreign earnings from its effective tax rate, which would increase the Company's value.

110

### c. Liability From Unrecognized Tax Benefits

Hubbard deducted a contingent liability of $3.01 billion from the Company's enterprise value for unrecognized tax benefits. Under FASB Interpretation No. 48 ("FIN 48"), a company must have a reserve on its balance sheet for unpaid taxes it may have to pay for taking a tax position on a prior return that may prove incorrect. *See* Fin. Accounting Standards Bd., *FASB Interpretation No. 48: Accounting for Uncertainty in Income* (2006) (codified as FASB Accounting Standards Codification 740-10-55-3). FIN 48 "requires the affirmative evaluation that it is more likely than not, based on the technical merits of a tax position, that an enterprise is entitled to economic benefits resulting from positions taken in income tax returns." *Id.* at 3-4. That is, the FIN 48 reserve measures the tax payment a company expects to pay if a taxing authority disagrees with its position even though it thinks it is more likely than not that its position is correct. The liability that Hubbard deducted equaled 100% of the Company's FIN 48 reserve.

Subtracting the full FIN 48 liability from the Company's enterprise value would be excessive. Under penalty of law, Company and its advisors deemed it more likely than not that their prior tax positions were reasonable. Tr. 302, 314 (Sweet) (testifying that the full FIN 48 reserve remains on the Company's books and reflects "the best estimate" of Dell's FIN 48 liability and that outside advisors vet that position); *see also* Tr. 937-38 (Shay). Subtracting the $3.01 billion from the DCF would imply that this court better understands the merits of the Company's tax positions than the Company does—without even having the opportunity to look at the underlying tax positions. The more persuasive

111

view is that the Company and its auditors correctly determined the Company's tax positions.

The analysis differs as to one item where Houlihan Lokey opined that it was "probable" and "reasonably estimable" that the Company would pay out $650 million from the FIN 48 reserve. JX 725 at 2, 11. That $650 million was "in the most mature stages of dispute resolution," and accordingly, it is reasonable to subtract it as a non-operating liability. *Id.* at 11. The Bank Case included the $650 million outflow in its projections.

This decision deducts $650 million from the Company's excess cash.

### 6. The Result Of The DCF Valuation

This decision adopts the parties' agreed upon calculation of 1,765,369,276 fully diluted shares outstanding. Using Hubbard's adjusted BCG 25% Case, which was likely somewhat conservative, a DCF analysis that incorporates the foregoing inputs generates a fair value per share of $16.43. Using Hubbard's adjusted Bank Case, which was likely somewhat optimistic, a DCF analysis that incorporates the foregoing inputs generates a fair value per share of $18.81.

Having no reason to prefer one realistic case over the other, this decision weights them equally. This approach has the additional benefit of arriving at a cost-savings number that is closest to management's best estimate of what the Company believed was attainable at the time of the Merger. In April 2014, after the Merger closed, the Company made a presentation to the rating agencies in which management stated that the Company had realized $1.6 billion in cost-savings in FY 2014. *See* JX 807. The Bank Case

112

assumed $2.6 billion in cost savings. Hubbard's adjusted BCG 25% case appears to have assumed approximately $660 million in savings. Averaging the two implies $1.63 billion in cost savings, which matches the figure management provided in April 2014.

Giving equal weight to the two DCF valuations generates a fair value of $17.62 per share.

## C. The Relationship Between The DCF Valuation And The Merger Price

The fair value generated by the DCF methodology comports with the evidence regarding the outcome of the sale process. The sale process functioned imperfectly as a price discovery tool, both during the pre-signing and post-signing phases. Its structure and result are sufficiently credible to exclude an outlier valuation for the Company like the one the petitioners advanced, but sufficient pricing anomalies and dis-incentives to bid existed to create the possibility that the sale process permitted an undervaluation of several dollars per share. Financial sponsors using an LBO model could not have bid close to $18 per share because of their IRR requirements and the Company's inability to support the necessary levels of leverage. Assuming the $17.62 figure is right, then a strategic acquirer that perceived the Company's value could have gotten the Company for what was approximately a 25% discount. Given the massive integration risk inherent in such a deal, it is not entirely surprising that HP did not engage and that no one else came forward. Had the valuation gap approached what the petitioners' expert believed, then the incentives to intervene would have been vastly greater.

Because it is impossible to quantify the exact degree of the sale process mispricing, this decision does not give weight to the Final Merger Consideration. It uses the DCF methodology exclusively to derive a fair value of the Company.

## III.    CONCLUSION

The fair value of the Company on the closing date was $17.62 per share. The legal rate of interest, compounded quarterly, shall accrue on this amount from the date of closing until the date of payment. The parties shall cooperate on preparing a final order for the court. If there are additional issues for the court to resolve before a final order can be entered, the parties shall submit a joint letter within two weeks that identifies them and recommends a schedule for bringing this case to conclusion, at least at the trial court level.